

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2008

# USA v. Kelly

Precedential or Non-Precedential: Precedential

Docket No. 06-4080

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Kelly" (2008). *2008 Decisions.* Paper 589.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/589

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4080
_____

UNITED STATES OF AMERICA,

                                        Appellant

v.

JAKE KELLY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 04-cr-00605)
District Judge: Honorable Jan E. Dubois

_____

Argued January 28, 2008

Before:  SCIRICA, <u>Chief Judge</u>, and
RENDELL and RODRIGUEZ,* <u>Circuit Judges</u>

_____

   *   Honorable Joseph H. Rodriguez, Senior Judge of the
       United States District Court for the District of New
       Jersey, sitting by designation.

(Filed: August 14, 2008)

Leo R. Tsao, Esquire    **[ARGUED]**
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
*Counsel for Plaintiff-Appellant*
   *United States of America*

Mark E. Cedrone, Esq.    **[ARGUED]**
Cedrone & Janove
Public Ledger Building
150 South Independence Mall West, Suite 940
Philadelphia, PA   19106
*Counsel for Defendant-Appellee*
   *Jake Kelly*

_____

OPINION OF THE COURT

_____

RENDELL, <u>Circuit Judge</u>.

In July 2005, a jury found Jake Kelly ("Kelly") guilty of possession of a firearm by a convicted felon in violation of

18 U.S.C. § 922(g)(1) and § 924(e). Soon after the jury verdict, Kelly moved for a new trial, arguing, *inter alia*, that he had recently discovered new evidence of his innocence—the hearsay statement of Victor Jones, who purportedly admitted to possessing the gun for which Kelly was arrested. After an evidentiary hearing at which Jones testified, the District Court granted Kelly's motion in part and ordered a new trial. The Government appeals the District Court's order, arguing that the Court abused its discretion in granting Kelly's motion. Specifically, the Government contends that the District Court erred in concluding that (1) Kelly had exercised sufficient diligence in regard to the discovery of the new evidence and (2) the newly discovered evidence would "probably produce an acquittal" at a new trial. For the reasons stated below, we will reverse the order of the District Court granting Kelly's motion for a new trial and remand for the entry of a judgment of conviction and sentence.

## BACKGROUND

### I.     The Record at Trial

On September 28, 2004, Kelly was charged in a one-count indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On July 19, 2005, the matter proceeded to trial in the United States District Court for the Eastern District of Pennsylvania.

3

At trial, the jury heard testimony that, on May 1, 2004, approximately nineteen officers and inspectors from the Philadelphia Police Department's Vice Enforcement Unit and Narcotics Strike Force, the Philadelphia Department of Licenses and Inspections, and the Pennsylvania State Police conducted an "open inspection"[1] of Café Breezes, a row house bar located at 5131 Columbia Avenue. (App. 81-82.) At about 1:00 a.m. that morning, two plainclothes "decoy" officers entered the bar to determine whether any illegal activity was taking place. (App. 81.) After being inside for approximately fifteen to twenty minutes, the decoy officers contacted Corporal Raymond Drummond of the Vice Enforcement Unit, who then led the rest of the officers into the bar, announced their presence, and explained that they were there to conduct an open inspection. The Government called three of the officers present that morning, including Corporal Drummond, to recount the morning's events.

---

[1] Open inspections of "nuisance bars" (App. 80) are conducted by a task force of state and local officials "to see if any illegal activity [is] being conducted such as underage drinking[ and/or] narcotics sales" (App. 81) and to check for fire code, electrical code, and liquor enforcement violations. An open inspection is not performed pursuant to a search warrant and, accordingly, bar patrons are generally not searched as part of the exercise unless illegal activity (such as drug or gun possession) is witnessed out in the open.

4

The officers testified that the bar within Café Breezes was in the shape of a backward "L," with the short side of the bar positioned closest to the establishment's front door. Officer Donna Stewart, a member of the Narcotics Strike Force, stated that once she entered Café Breezes, she placed herself between the bar and the front door and monitored the patrons closest to her, while other officers monitored the patrons at the other end of the bar. According to Officer Stewart, there were six people sitting toward the front of the bar, two of which were the decoy officers.[2] A man, later determined to be Kelly, was seated on the far right of the short section of the bar; two unidentified women sat to his left; and an unidentified man sat around the corner of the bar to Kelly's right. The unidentified man sat at the first barstool on the long section of the bar, and the decoy cops sat directly to his right.

Officer Stewart testified that, almost immediately, she took note of Kelly, as "he was looking around, kept looking over his shoulder, he looked in my direction, he looked in the direction of the door. He . . . appeared to be following the other officers as they walked into the bar with his eyes. He started to sweat, he was fidgeting on his barstool, he couldn't stay still." (App. 125.) Officer Stewart eventually left the front of the bar to speak with her partner, Officer Brant Miles, another of the

---

[2]Corporal Drummond testified that there was a total of 8 to 10 people in the bar when the officers and inspectors entered.

5

officers the Government called at trial. According to Officer Stewart, she returned to her post at the front of the bar—along the wall between Kelly and the female seated to his left—within "maybe ten seconds." (App. 125.) At that point, Officer Stewart observed that Kelly "was leaned over, crunched over in his seat with his hands below the bar where I couldn't see them and he stopped fidgeting. He kept moving his head around, he kept looking around but he had stopped moving his body." (App. 126.) Officer Stewart next described the following events:

> When I returned to the front of the bar I stood there for maybe another minute or two, just keeping an eye on everyone, keeping an eye on the defendant. A Vice Officer asked someone for their ID much further down the bar. It was at that point that the defendant reached quickly towards his back. At that point I stopped him, I put my hands on him, I had him put his hands on the bar. I walked around behind the defendant so I was standing between the defendant and the female to his left and at that point I had him stand up. As he stood up[,] the gun fell from his lap, it was about mid-thigh. It fell down along his left leg, it hit the brass chair rail at the base of the bar with a loud metal clang and then it landed on the floor.

6

I yelled "Gun." Other officers rushed up towards me, they placed handcuffs on the defendant and I recovered the weapon from the floor.

(App. 127-28.) Both Corporal Drummond and Officer Miles testified that they heard Officer Stewart yell "gun" (App. 83, 177); Officer Miles testified that he heard a preceding "thud" (App. 177). Neither Corporal Drummond nor Officer Miles testified that he saw the gun fall from Kelly's lap, as both men were positioned at different locations along the bar. After recovering the gun, Officer Stewart gave it to Officer Miles, who removed the magazine and a bullet from the chamber.

The Government's final witness at trial, Officer Ernest Bottomer of the Philadelphia Police Department's Firearms Identification Unit, testified that the weapon in question was indeed a "firearm" as defined by federal law and that he could not retrieve a serial number from the firearm. The parties ultimately stipulated that (1) the gun qualified as a firearm for the purpose of the statute under which Kelly was charged; (2) the firearm had been manufactured outside of Pennsylvania; and (3) prior to May 1, 2004, Kelly had been convicted of a crime punishable by imprisonment for more than one year within the meaning of 18 U.S.C. § 922(g). *United States v. Kelly* ("Dist. Ct. Op."), Crim. A. No. 04-605, 2006 WL 2506353, at *2 (E.D. Pa. Aug. 29, 2006). Kelly offered

7

several photographs of Café Breezes into evidence, but called no witnesses on his behalf.[3]

On July 21, 2005, the jury found Kelly guilty of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and § 924(e).

## II.     Post-Trial Proceedings

Not long after the trial ended, Kelly retained new counsel, who, on August 1, 2005, filed a Motion for New Trial and Leave to Supplement pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33") on Kelly's behalf.[4]    Leave to supplement was granted, and Kelly filed his counseled

---

[3]Before the trial began, Kelly alleged that, at some point after he was arrested, he stated, "Someone threw the gun at me." Dist. Ct. Op. at *1.  The Government filed a *motion in limine* to exclude the statement, and the District Court preliminarily ruled that it would be excluded unless defense counsel could lay foundation for admitting it as an excited utterance or present sense impression.  At trial, defense counsel made no attempt to lay such a foundation, and thus, the statement was never heard by the jury.

[4]Though Kelly requested (by *pro se* letter) and received a sixty-day extension to file a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, he never filed such a motion.

supplemental motion on October 6, 2005. In that motion, Kelly argued, *inter alia*, that he had recently discovered evidence of his innocence that justified the granting of a new trial. Kelly attached to the motion a statement from Kemahsiah Gant ("Gant"), a friend of Kelly's, that described a conversation between Gant and a mutual acquaintance, Victor Jones ("Jones"), who was at Café Breezes the night of Kelly's arrest. According to Gant's statement, sometime in the summer of 2005, she was talking to Jones about Kelly's gun charge, and Jones told her "that the gun was not Jake's gun the police found. . . . [Jones] said he had the gun. When the police came in[,] he got nervous and threw it down on the floor." (App. 424.) When Gant asked Jones why he had not come forward earlier, Jones did not answer. A few weeks later, after struggling with the decision, Gant recounted the conversation to Kelly's girlfriend, Jackie Cephas ("Cephas"), who encouraged Gant to speak with Kelly's lawyer. About a month and a half later, Gant did so. Gant's statement was given just two days before Kelly filed his supplemental motion for a new trial.

On June 8, 2006, after briefing on the motion was complete, the District Court held an evidentiary hearing to address Kelly's newly discovered evidence claim. At the hearing, Kelly called three witnesses: Gant, Cephas, and Jones.[5]

---

[5]The District Court appointed counsel to represent Jones at
(continued...)

## A. Gant

As the first witness to take the stand, Gant testified that she had known Cephas, Kelly, and Jones each for approximately eight years as of the date of the hearing. In the past, Gant, Cephas, and Jones had all worked at the same company and lived on the same block (the 800 block of Wynnewood Road) in Philadelphia, about eleven blocks from Café Breezes. Though Gant eventually moved to another neighborhood within the city, Cephas and Jones—who Gant described as "good friends" (App. 287)—remained. When asked by defense counsel how Kelly fit into the "circle of friends," Gant testified that she had known Kelly "as long as [she'd] known Jackie [Cephas]." (App. 288.) Kelly and Cephas had been dating "[a]bout on and off for eight years." (App. 288.)

According to Gant's testimony, the "circle of friends" would "all hang out at" Café Breezes, "a neighborhood bar" where Gant considered herself a "regular patron" and where Jones, Kelly, and Cephas would frequent "[e]very week." (App. 289.) Though Gant was not at Café Breezes the morning of Kelly's arrest, "people at the bar" told her that Kelly had been

---

[5](...continued)
the hearing and to advise him of his Fifth Amendment right against self-incrimination.

arrested "'[f]or a gun'" when she arrived there later that day. (App. 311.)

On July 21, 2005, as "support for Jackie and also Jake," Gant accompanied Cephas to court for the reading of Kelly's verdict. (App. 292.) About a week or so later, after an unsuccessful attempt at visiting Cephas, Gant stopped by to see Jones, who lived only a "half a block" away from Cephas. (App. 296.) Gant explained that she and Jones were having a general conversation about who amongst their friends would be the next to get married. Gant surmised that it would have been Cephas and Kelly were it not for Kelly being in prison. At that point in the conversation, Gant testified that Jones paused and said, "I have something to tell you." (App. 297.) When Gant asked what it was, Jones stated, "It wasn't Jake's gun." (App. 297.) Jones then revealed that it was he who had the gun and threw it on the floor. Gant asked, "Well, why didn't you say anything[?]" (App. 299.) Jones never responded.

A few weeks after this conversation, Gant approached Cephas with what she had learned.[6] Cephas asked Gant to speak with Kelly's attorney, but Gant initially refused. Sometime in

---

[6]Gant testified on direct examination that she waited so long to tell Cephas because she did not want to "rat Victor out" (referring to Jones) and "really didn't want to get involved, period, with the case" due to a prior experience as a witness to a crime. (App. 301-03.)

September 2005, however, Gant changed her mind, and on October 4, 2005, she met with Willard Brown ("Brown"), an investigator for Kelly's attorney. According to Gant, during her conversation with Brown, he drafted a statement, which she reviewed and signed. It was this statement that served as the basis for Kelly's supplemental motion for a new trial. Gant never returned the telephone calls of the Government's investigator, Chris Lee.

When asked if she had any discussions about the substance of Kelly's case with either Jones, Cephas, or Kelly between the date of Kelly's arrest and his subsequent conviction, Gant testified that she had not. According to Gant, she never asked any questions about Kelly's case because she "did not want to get involved at all" and because she "had [her] own issues at the time." (App. 333-34.)

**B.    Cephas**

The second witness to testify at the evidentiary hearing was Cephas, Kelly's girlfriend of over eight years. At the beginning of her testimony, Cephas was asked several questions about her relationships with Kelly, Gant, and Jones. She confirmed that she had been romantically involved with Kelly for "going on nine" years as of the date of the hearing. (App. 338.) As to her relationship with Gant, Cephas described her as a "good friend[]" (App. 339), who she met initially through work and who, in the past, lived "three, four doors down" from

12

Cephas on Wynnewood Road. (App. 338.) Cephas met Jones through work as well, and the two "[f]riends" (App. 339; *see also* App. 340) "ended up living on the same block," *i.e.*, the 800 block of Wynnewood Road (App. 339). Though Gant had moved from the neighborhood, Cephas and Jones continued to live on the same block. Cephas explained that Kelly knew Gant and Jones through her and that the group would socialize together at Café Breezes. Cephas was not at Café Breezes the night of Kelly's arrest.

When asked about her contact with Jones between Kelly's May 1, 2004 arrest and his July 21, 2005 conviction, Cephas testified that she certainly would have seen Jones during that time period because, "We live on the same block and we're friends." (App. 345.) The two did not, however, discuss Kelly's case other than Cephas mentioning that Kelly was going to court. Cephas further testified that both she and Kelly got together with Jones at Café Breezes "[m]aybe about" twenty times after Kelly's arrest and before his conviction.[7] (App. 355.) According to Cephas, when she, Kelly, Jones, and Gant were together before Kelly's conviction, the group did not speak about Kelly's case. And when asked by the Court, "Were there any discussions before the verdict between you and Kelly and

[7]Cephas indicated that, although Kelly and Jones would speak at Café Breezes, the conversations were not extensive, as they "had nothing to talk about" outside of their common connection to Cephas. (App. 354.)

Ms. Gant and Mr. Jones . . . either together or separately about the gun?," Cephas responded, "About the gun, no. No." (App. 358.)

As to her post-trial conversation with Gant, Cephas explained that, a couple of weeks after the verdict, Gant came to her and told her, "you know, [Jones] told me he was there the night when Jake got arrested and he threw the gun and Jake was apprehended for it." (App. 346.) After learning this, Cephas contacted Kelly's attorney (without first contacting Kelly), who expressed interest in having one of his investigators speak to Gant and Jones. For a few weeks, Gant refused to speak with anyone, but eventually she agreed. In the meantime, Cephas testified that she "confronted" Jones about what Gant had told her, asking him, "Why didn't you tell me? You could have told me before you told her." (App. 349-50.) According to Cephas, Jones said nothing in response, "he just looked dazed and straight. . . . As if he knew he was wrong." (App. 350.)

Cephas testified that, although she and Kelly did not frequently speak about his case, when they did discuss the case, Kelly "just kept on saying it wasn't his gun." (App. 351, *see also* App. 352.) Kelly did not explain anything more about the circumstances surrounding his arrest. In fact, Kelly never told Cephas that Jones was at Café Breezes the night of the arrest, and Cephas did not find out that Jones was at the bar until her conversation with Gant.

14

### C.  Jones

The last of the defense witnesses to take the stand was Jones.  Jones confirmed that he lived on the 800 block of Wynnewood Road, the same block as Cephas, and described Cephas as "one of my best friends."  (App. 365; *see also* App. 385 ("Me and Jackie's work lives conflicted but because she is a good friend of mine, I mean I would go to her house any time of the night or any time of the day, it didn't really matter.")  He testified that he was "friends" with Kelly through Cephas[8] (App. 385, *see also* App. 366) and that, although he and Kelly would not go out together without her, the two men would talk and hang out when they were together.

As to Café Breezes, Jones described it as a "hang-out spot" where, "[a]t some point," Jones, Cephas, Kelly, and Gant would go "every Tuesday, Thursday, Friday" and also Saturdays.  (App. 367, 386.)  Jones and Kelly were both at Café

---

[8]When asked on cross-examination, "How long have you known Jake Kelly?," Jones readily volunteered, "I think Jackie's been dating [Kelly] for a couple of years.  I mean, at this point it's been a few years, yeah."  (App. 385.)  But when Jones was asked on direct examination, "[W]hat is your understanding of Mr. Kelly's relationship with Ms. Cephas?," he responded, "I mean I know they know each other.  I mean I don't know how well of friends they are but I know they know each other." (App. 366.)

Breezes on May 1, 2004, the morning of Kelly's arrest. (App. 386.) When first asked if he had been drinking that night, Jones responded, "Not a lot." (App. 369.) Later in his testimony, however, Jones volunteered that he was so "drunk" that "the room was spinning." (App. 392.)

Jones painted a picture of a very crowded bar with no empty seats and people standing all around him. (App. 370, 372 ("I mean, there was people were bumping into me all night, it was pretty tight."), App. 389 ("There was people . . . standing next to me, there were people standing behind me, there was people . . . on both sides, there were people standing all around me.").) He testified that when the police entered Café Breezes, he was sitting on the long side of the inverted L-shaped bar in the first seat closest to the front door, and Kelly was sitting around the corner to his left, on the short side of the L shape. (*See* App. 370 ([W]e were kind of next to each other.").) When asked to describe, in his own words, what happened when he first realized that the police were present, Jones set the following scene:

> I was sitting at the bar. I had pretty much done drinking, I didn't want to drink any more, I was ready to go. There was a little bit of pushing, somebody pushed my shoulder, kind of like my back but people were brushing into me all night. Somebody brushed into me and somebody put

16

something in my lap and it was a gun.  And I
pushed it off of my lap onto the floor.

(App. 372.)  Jones at first could not remember from which direction the gun came and in which direction he pushed it off his lap, but when pressed on cross examination, Jones provided several additional details.  Jones deduced that the gun "came from probably the right side of me, more so than the left side of me" (App. 389), and fell in front of him, slightly to his left, because he brushed it with his left hand.  As the gun fell, it first hit the base of the bar, which was wood, and then dropped to the tile floor, making a "clackety sound" (App. 388); it did not hit the metal bar at Jones's feet.  Jones turned around to see who dropped the gun in his lap, but could not tell who did it.  According to Jones, there were no words—spoken or unspoken—between him and Kelly after the gun dropped to the floor.  Jones did not provide any details about Kelly's actual arrest; he did testify that at some point after the gun fell to the floor, the police "swarmed the corner" of the bar and recovered the gun.  (App. 373.)

Jones testified that he was "pretty sure" that the gun he pushed from his lap was the same gun for which Kelly was arrested.  (App. 374.)  Though Jones "thought that [Kelly] was wrongly arrested," he did not say anything because he "didn't want to have anything to do with it."  (App. 376.)  Between Kelly's arrest and his conviction, Jones did not speak to anyone about what happened that night.  After Jones admitted on cross-

17

examination to seeing Kelly anywhere from one to three times after Kelly's arrest, the following exchange occurred between Jones and the Government:

Q:    Did he [Kelly] ever - - did he ever talk to you about his criminal case?

A:    No.

Q:    Did he ever ask you what happened?

A:    No.

Q:    He never said to you:  hey, Victor, you were sitting right next to me, did you see who threw the gun?

A:    No.

Q:    He never mentioned his criminal case at all to you, at all?

A:    We didn't discuss the case.  Actually, when I was, at the time I was seeing him I really thought it was over.  I didn't know that he still had a case.  When I saw him

18

> after that incident [his arrest] I assumed
> that it was over.

(App. 395.)

Toward the end of his direct testimony, Jones was asked to describe the conversation he had with Gant after Kelly's conviction. According to Jones, Gant stopped by his apartment, where the two were "just hanging out for a minute," and Gant asked him if he had heard what happened to Kelly. (App. 380.) Gant told Jones that Kelly was in jail on the gun charge, and Jones responded that that was "fucked up because it [the gun] wasn't his." (App. 380.) Gant asked Jones how he knew that the gun was not Kelly's, and Jones "told her what happened." (App. 380.) On cross examination, Jones explained:

> I told her that I was sitting at the bar pretty much next to Jake and when the cops came in, which I didn't really see when the cops came in. I didn't realize that the cops were actually in there behind me until somebody dropped that [gun] in my lap. And once it got dropped in my lap[,] I pushed it off and I mean and that's what, and that's in fact how I knew it wasn't his. I knew that he didn't do it. And that's pretty much what I told [Gant].

(App. 387.) Jones testified that he never told Gant that he threw the gun because he was nervous when the police walked in.

19

At some point after this conversation, Cephas came to Jones and "asked [him] why [he] didn't tell her what happened" (App. 381); she did not ask him for his version of what happened, but did ask him to speak to a defense investigator. At first, Jones refused, but then eventually agreed. Jones told the investigator that if anyone were to serve a subpoena on him or ask him to testify, he "wouldn't give a comment" and "would plead the Fifth" because he "didn't want to discuss it." (App. 382.) After that conversation, Kelly's counsel contacted Jones to explain that the Court wanted to appoint counsel for him; they did not discuss the facts of the case or the substance of Jones's potential testimony. Jones never met with the Government's investigator, despite the investigator's offer to "speak with [him] any time and anywhere." (App. 400.)

When questioned about his decision not to invoke his Fifth Amendment rights, Jones first explained, "I had a change of heart only because come thinking about it, I felt that I could get myself into trouble by really not saying what happened if you're asking me questions and I only say I plead the Fifth[.] . . . I don't know, it just didn't feel right. I've never . . . heard of anybody actually doing it. I know that it's the Fifth Amendment but I've never actually heard of anybody going to Court and saying they plead the Fifth." (App. 397.) Before his testimony ended, Jones clarified, "I don't feel that I did anything wrong. I felt that it would be better for me to say exactly what happened rather than to just say no comment." (App. 399.)

20

### D. Officer Clark

After the testimony of Kelly's witnesses, the Government called Philadelphia Police Officer Clarence Clark of the City's Vice Squad. Officer Clark was one of the two decoy officers sent into Café Breezes the morning of Kelly's arrest. While there, their responsibilities were to "look for any underage drinkers, any illegal drugs or any illegal activity going on within the bar." (App. 408.)

According to his testimony, Officer Clark and the other undercover officer, Officer Fairbanks, entered Café Breezes at "approximately 12:00, 1:00 o'clock in the morning" on May 1, 2004. (App. 407.) The officers walked to the bar and sat in two seats close to the door; Officer Clark took the seat immediately to the right of Jones, and Officer Fairbanks sat immediately to the right of Officer Clark. Officer Clark confirmed that Kelly was seated in "[t]he first seat on the other side of the L of the bar" next to two females. (App. 409.) After ordering a beer and engaging in conversation with Officer Fairbanks, Officer Clark got up from his seat and went to the bathroom area to call his supervisor, Corporal Drummond, to the scene. After Officer Clark returned to his seat, Corporal Drummond arrived and announced that he and members of the Vice Squad and L&I Unit were there to do an open inspection of the bar. Officer Clark did not hear a gun drop to the floor when the police entered the bar, nor—from where he was sitting at the bar—did Officer Clark remember hearing "a loud metal clang" around the

21

time of Kelly's arrest. (App. 413-14.) According to Officer Clark, "all I remember hearing is a yell, someone yelling 'gun.'" (App. 413.) At that point in time, Officer Stewart was closer in proximity to Kelly than was Officer Clark.

When asked directly whether there was anyone sitting behind him when Corporal Drummond and the others arrived, Officer Clark responded, "No." (App. 411.) He also testified that there was no one standing behind the person seated to his left, *i.e.*, Jones.

## III.    Post-Hearing Proceedings

After supplemental briefing, the District Court denied Kelly's motion in part, granted it in part, and ultimately concluded that Kelly's newly discovered evidence warranted a new trial.[9]  The Government filed a timely notice of appeal.

---

[9]Kelly had also based his new trial motion on arguments that (1) trial counsel was ineffective; (2) the guilty verdict was against the weight of the evidence; and (3) the Court erred by excluding Kelly's statement that "someone threw the gun at [him]." The District Court ultimately rejected these arguments, dismissing Kelly's ineffective assistance of counsel claim without prejudice and the remaining claims on their merits. Because Kelly has not appealed these aspects of the District Court's ruling, we do not discuss them in detail here.

22

We have jurisdiction to review this matter pursuant to 18 U.S.C. § 3731.

**STANDARD OF REVIEW**

As a motion for a new trial under Rule 33 is directed to the district court's discretion, "our function on appeal is to decide whether the trial judge abused that discretion or failed to exercise it." *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976). "By definition, a district court 'abuses its discretion when it makes an error of law.'" *United States v. Askari*, 140 F.3d 536, 539 (3d Cir. 1998) (en banc) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)), *vacated on other grounds*, 159 F.3d 774 (3d Cir. 1998). Thus, "'[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.'" *Id.*

**DISCUSSION**

As this Court has consistently held, a defendant must meet five requirements before he may be granted a new trial on the basis of newly discovered evidence:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the [defendant]; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly

discovered evidence would probably produce an acquittal.

*Iannelli*, 528 F.2d at 1292. "Although the decision to grant or deny a motion for a new trial lies within the discretion of the district court, the movant has a 'heavy burden' of proving each of these requirements." *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). If just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail. *United States v. Jasin*, 280 F.3d 355, 365 (3d Cir. 2002). Courts should "exercise great caution in setting aside a verdict reached after fully-conducted proceedings," and particularly so where "the action has been tried before a jury." *United States v. Kamel*, 965 F.2d 484, 493 (7th Cir. 1992) (internal quotation marks omitted).

In this case, the District Court concluded that Kelly had met his burden of establishing each of the *Iannelli* requirements. On appeal, the Government challenges the District Court's disposition as to two of the requirements: diligence and probability of acquittal. We address each of the challenged requirements in turn.

## I.     Diligence

The Government contends that the District Court applied the incorrect legal standard in concluding that Kelly had satisfied the diligence prong of the *Iannelli* analysis.

Specifically, the Government argues that the District Court erred in focusing its diligence inquiry on Kelly's post-trial efforts to bring Jones's testimony to the attention of the Court once the potential testimony was discovered, as opposed to focusing on Kelly's pre-trial efforts to discover Jones's testimony in the first place. We agree.

As recognized above, the second prong of the *Iannelli* analysis requires a defendant to allege facts "from which the court may infer diligence." *Iannelli*, 528 F.2d at 1292. In applying this prong, we have consistently focused our inquiry on whether the evidence at issue could have been discovered before or at the time of trial with the exercise of reasonable diligence on behalf of the defendant and/or his counsel. *Id.* at 1293; *Cimera*, 459 F.3d at 462-63. In *Iannelli* itself, we affirmed the district court's denial of the defendants' new trial motion, as the newly discovered evidence "could have been discovered at the time of trial" and the defendants "d[id] not allege any facts from which the court c[ould] excuse their lack of diligence . . . prior to trial." *Iannelli*, 528 F.2d at 1293. More recently, in *United States v. Cimera*, we reversed the district court's decision to a grant a new trial on the basis of newly discovered evidence where the defendant "failed to establish . . . that [the supporting evidence] could not have been discovered with the exercise of reasonable diligence before or at the time of the trial." 459 F.3d at 462-63; *see also Government of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985) (affirming district court's denial of defendant's motion for new trial based on newly

discovered evidence, finding, *inter alia*, that witnesses whose testimony formed the basis of defendant's new trial motion "could easily have been found *in time for trial* by the exercise of diligence" (emphasis added)); *United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir. 1993) (stating that "newly discovered evidence must be evidence that trial counsel *could not have discovered* with due diligence *before trial*" (second emphasis added)).

In this case, the District Court concluded that Kelly had "met his burden of establishing that he was diligent with respect to the newly discovered evidence," Dist. Ct. Op. at *11, as "Kelly was diligent in bringing Jones's testimony to the Court's attention," *id.* at *12. In reaching this conclusion, the District Court laid out the sequence of events leading up to Jones's prospective testimony, beginning with the date of Kelly's conviction and highlighting only post-trial events. Although the District Court found that "[a]t [the] time[ of his conviction], Kelly did not know about Jones's contact with the gun," the Court never addressed whether either Kelly or his counsel could have discovered the information before trial with the exercise of reasonable diligence.

A review of the pre-trial record reveals absolutely no evidence—nor allegation—of pretrial diligence on Kelly's behalf. The record could not be more clear that Kelly made no effort to speak with Jones—despite seeing him anywhere from one to twenty times after the arrest—about what he might have

27

witnessed the morning of May 1, 2004. As we held in *Government of the Virgin Islands v. Lima*, 774 F.2d 1245 (3d Cir. 1985), such inaction simply does not qualify as reasonable diligence.

In *Lima*, after the defendant was convicted and sentenced for burglary, assault, and possession of a firearm, he filed a motion for new trial based on the affidavits of three newly discovered witnesses. Two of the witnesses, Rivera and Sanchez, stated in their affidavits that, although they were out on Rivera's porch the night of the alleged incident, neither person saw the defendant enter or exit the victim's house. According to her affidavit, Rivera lived directly across the street from the victim.

In addressing the diligence prong of the *Iannelli* test and ultimately finding that it had not been met, the district court stated:

> With even a moderate amount of diligence these witnesses and their testimony could have been discoverable prior to trial. [The] witnesses are persons well known to defendant (Jose) and who know him well. The location of Hipolita Rivera's residence could not possibly be a secret to defendant. Common prudence would have dictated that she be interviewed as a neighbor likely to throw light on the matter. This could and

28

should have been done immediately after the arrest of defendant.

*Id.* at 1249 (quoting the district court).

On appeal, Judge Becker agreed with the district court, concluding easily that the defendant had not met his burden of establishing reasonable pretrial diligence as to the testimony of Rivera and Sanchez:

> The proffered testimony also runs afoul of the "diligence" prong of *Iannelli* because Sanchez and Rivera were friends of [the defendant], one of whom resided directly across the street from the location of the incident. It would seem that they could easily have been found in time for trial by the exercise of diligence.

*Id.* at 1250.

The facts of *Lima* are analogous to the facts of this case. First, whether we label Kelly and Jones as "friends" or "acquaintances," it is undisputed that (1) the two men knew each other; (2) they were sitting next to each other the night of Kelly's arrest; and (3) they saw each other at least once after Kelly's arrest and before his conviction. We can also infer that Jones's home address was no secret to Kelly, as Jones lived on the very same block as Kelly's girlfriend of eight years (with whom Jones was "best friends"). In light of these facts, we see

29

no reason why Jones could not and should not have been "interviewed as a [witness] likely to throw light on the matter," *Lima*, at 1249, prior to Kelly's trial, or at the very latest, before his conviction; and Kelly provides us with none. Kelly makes no effort to distinguish *Lima* and does not even acknowledge the case as precedent in his brief on appeal.

Faced with Jones's undisputed testimony that Kelly never once spoke to him about what happened at Café Breezes on May 1, 2004, Kelly does not argue that he in fact exercised pretrial diligence in relation to Jones's potential testimony, nor does he contend that he could not have interviewed Jones before his trial began. Instead, Kelly seeks to excuse his lack of pretrial diligence by arguing—as he did before the District Court—that, prior to trial, he had no reason to believe (1) that it was Jones who possessed and threw the gun, and/or (2) that Jones would have acknowledged possessing the gun. (Appellee's Br. 14-15; 20.) Essentially, Kelly argues that, because he did not know what Jones would say in response to being questioned, Kelly had no duty to question him. Though the District Court appears to have accepted this narrow formulation of a defendant's duty to exercise pretrial diligence, we cannot.

Kelly's claim that he "had no reason to know that it was Jones who threw the gun and . . . that Jones was willing to acknowledge this fact" (Appellee's Br. 20) misses the point. Though Kelly may have had no reason to know the exact

30

substance of Jones's potential testimony, he had every reason to question Jones about the gun—which Kelly claimed was not his—and about what he may have witnessed the morning of Kelly's arrest. As the Government points out in its brief, Jones may have been able to provide Kelly with evidence to corroborate his theory that "someone threw the gun at [him]." *See supra* note 3. Kelly could have asked Jones if he saw who threw the gun at him or from what direction it was thrown; he could have asked Jones if he saw someone with a gun earlier that night or heard people talking about the incident after his arrest. And while there is always the possibility that Jones would have been unable—or unwilling—to provide Kelly with the answers to these questions, we will never know *because Kelly never asked them*. Any potential or anticipated futility in doing so—without more—does not excuse Kelly from his duty to exercise reasonable diligence before trial.[10]

---

[10]*Cf. United States v. Schaffer*, 214 F.3d 1359, 1362 (D.C. Cir. 2000), *vacated as moot*, 240 F.3d 35 (D.C. Cir. 2001) ("[A] belief in the futility of [subpoenaing a potential witness or seeking a continuance to procure his testimony] will not satisfy the need for a concrete attempt either to compel the production of relevant evidence or to seek some accommodation from the trial court that would preserve the defendant's right to present evidence that was critical to his case. Whatever the minimum requirement of diligence, it cannot be a purely private evaluation of the availability of the testimony or the likelihood of relief
(continued...)

Unable to cite any precedent from this Circuit, or from any of our sister circuits, in support of his position,[11] Kelly relies heavily on two cases from district courts in our circuit—*United States v. Carmichael*, 269 F. Supp. 2d 588 (D.N.J. 2003), and *United States v. Morales*, No. 90-441-2, 1991 WL 276022 (E.D. Pa. Dec. 18, 1991)—"only to demonstrate that when confronted with similar circumstances, other courts have reasonably employed the same approach as did the district court here." (Appellee's Br. 15 n 8.)  While we express no opinion as to the propriety of the district courts' decisions in these cases, we discuss them here, as they are distinguishable on their facts and thus ultimately unavailing.

In *Carmichael*, after a trial for gun possession, the defendant presented the affidavit of a witness who admitted that the gun in question belonged to him.  Upon receiving this affidavit and hearing live testimony, the district court granted defendant's motion for a new trial, finding that "the defendant had no way of knowing at the time of trial that Mr. Harvey[, the

---

[10](...continued)
from the court.  Such a standard would seriously impair the important goal of finality that the diligence requirement serves.")

[11]The Government cites *several* cases from our sister circuits in support of its position on appeal.  As none are necessary to our disposition, we do not discuss them here.

32

witness,] was the owner of the gun, or at least that he would admit to being the owner." *Id.* at 597. In reaching this conclusion, the district court relied on the fact that Harvey had testified before a federal grand jury prior to the defendant's trial. During his sworn testimony, Harvey claimed that he did not know to whom the gun belonged and denied being on the porch where the gun was found. *Id.* at 592. The district court thus concluded that "[n]othing in Mr. Harvey's grand jury testimony could have alerted the defendant to the prospect that Mr. Harvey could be a helpful witness if called at trial."[12] *Id.* at 597.

Here, unlike in *Carmichael,* Kelly had no reason to believe that Jones would *not* have been a helpful witness if called at trial. Jones was never questioned before trial about the gun or about what he witnessed the night of Kelly's arrest, he never affirmatively denied knowledge of the circumstances surrounding that night; and he certainly did not provide sworn testimony to any court until after Kelly's conviction. Had Jones been questioned pretrial and had he denied knowledge of the gun, we would be presented with a different scenario. It is undisputed that Jones was not questioned, and thus *Carmichael* is clearly distinguishable.

---

[12]We assume, as is implied throughout the district court's opinion, that the defendant had pretrial access to Harvey's grand jury testimony.

*United States v. Morales*, No. 90-441-2, 1991 WL 276022 (E.D. Pa. Dec. 18, 1991)—the only case cited by the District Court in support of its conclusion—is also distinguishable on this issue. In *Morales*, the defendant was convicted by a jury for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute.

At trial, a government witness testified to seeing the defendant enter the home of a co-defendant while carrying a red and black bag that was later found to contain cocaine. After the defendant was convicted, he moved for a new trial based on a newly discovered witness, who testified at a post-trial evidentiary hearing that she had observed the defendant carrying only his child and not a bag as he entered the co-defendant's home on the day in question. In addressing the diligence prong of the *Iannelli* analysis, the district court specifically found that "there was no evidence presented at the evidentiary hearing that *defendant* . . . had any reason to know Ms. Gonzalez[, the newly discovered witness,] had witnessed defendant entering the co-defendant's home." *Id.* at *1 (emphasis in original). Thus, the district court concluded that "the delay in Ms. Gonzalez coming forward cannot be attributed to a lack of diligence on behalf of the defendant." *Id.*

In this case, as recognized above, Kelly had *every* reason to know that Jones was a potential witness in his case. Again, it is undisputed that, not only was Jones present at Café Breezes the night of Kelly's arrest, but he was sitting next to Kelly when

34

the arrest occurred. Kelly criticizes the Government for "ignor[ing] the fact that Jones stated that he intentionally kept his involvement secret because he did not want to become involved," apparently believing that consideration of this fact would weigh in his favor. (Appellant's Br. at 17.) *See also* Dist. Ct. Op. at *11. It does not. What Kelly himself ignores in making such a statement is that the duty to conduct reasonable diligence before or at the time of trial lies with the defendant and his counsel. The fact that *Jones* did not volunteer his testimony to Kelly has no bearing on the question of whether Kelly took affirmative steps to discover that testimony in the first instance. Sitting on one's hands and waiting for a known eyewitness to come forward with potentially exculpatory information (or potentially inculpatory information from Jones's perspective) cannot be considered — by any definition — reasonable diligence. Were we to sanction the granting of a new trial under such circumstances, *Iannelli*'s diligence requirement would quickly be rendered meaningless.

Considering all of the circumstances surrounding this case, the fact that Kelly did not even attempt to question Jones—or have Jones questioned—prior to his trial is both shocking and inexcusable. It is thus with little hesitation that we conclude that he has failed to satisfy the second prong of the *Iannelli* analysis. Because it is undisputed that Kelly made no attempt to procure Jones's testimony prior to his conviction, his motion for a new trial should have been denied.

Accordingly, we will reverse the District Court's order granting his motion.

## II.    Probability of Acquittal

The Government also challenges the District Court's resolution of the fifth prong of the *Iannelli* analysis:   the requirement that, "on a new trial, the newly discovered evidence would probably produce an acquittal."  *Iannelli*, 528 F.2d at 1292.  Because we have already determined that Kelly did not meet his "heavy burden" of establishing *Iannelli*'s diligence requirement, we need not reach this second issue as a means of justifying our reversal of the District Court's order.  *See Jasin*, 280 F.3d at 365.  However, as it appears that *Iannelli*'s fifth prong has caused some confusion in our district courts, we will discuss its application here, so as to provide clarity to this area of the law.

Before the District Court, the Government argued that Kelly's new evidence would not "probably produce an acquittal," as Jones's testimony was "simply too fantastic to be accorded much evidentiary weight."  Dist. Ct. Op. at *12 (internal quotation marks omitted).  The Government urged the District Court to conclude that the testimony was not credible and that, accordingly, Kelly could not satisfy the fifth prong of *Iannelli*.  In support of its argument, the Government identified several inconsistencies in the testimony of Jones, Gant, and Cephas; criticized Jones's testimony for conveniently absolving

36

both Kelly and Jones of any criminal liability; and argued that Jones's relationship with both Kelly and Cephas gave him a strong motive to lie on behalf of his friends. The Government also reminded the Court that Jones admitted to being very intoxicated the night of Kelly's arrest and asserted that, at a new trial, Jones's testimony would be contradicted by the testimony of Officers Stewart, Miles, and Clark.

In its August 29, 2006 Memorandum Opinion, the District Court rejected the Government's position and "decline[d] to make . . . a credibility determination at this juncture." Dist. Ct. Op. at *12. The Court declared, at the outset of its discussion, that "Jones's prospective testimony, if believed, would probably produce an acquittal, and the jury is the appropriate fact-finder." Dist. Ct. Op. at *12.

In explaining why it would refrain from making a credibility determination, the District Court distinguished several cases cited by the Government and ultimately chose to adopt the reasoning employed in *United States v. Morales*, No. 90-441-2, 1991 WL 276022 (E.D. Pa. Dec. 18, 1991). In that case, although the district court admitted to finding "many inconsistencies" in the proposed testimony of a newly discovered witness, it nonetheless concluded that the "defendant is entitled to have a jury evaluate the credibility of [the witness]. If a jury finds her testimony to be credible, the jury may well have a reasonable doubt [as to the defendant's guilt]." *Id.* at *2.

37

After announcing that it would adopt "the *Morales* approach," Dist. Ct. Op. at *14, the District Court underwent the following analysis:

> Although the Court has some reservations about Jones's proposed testimony—notably, it nicely absolves both Kelly and Jones of criminal liability and it surfaced at a convenient time—the Court, out of an abundance of caution, concludes that Kelly is entitled to have a jury evaluate the credibility of Jones. The Court further concludes that *a jury is likely to find Jones's prospective testimony credible* for, *inter alia*, the following reasons: First it is not logical for Jones to perjure himself for the boyfriend (Kelly) of one of his friends (Cephas). Second, Jones had a strong motive not to come forward and to avoid discussing the incident until Gant reported that Kelly had been convicted. Third, Jones cannot benefit by falsely helping Kelly. Fourth, some time after the arrest but while still at the bar, Kelly stated "someone threw the gun at [him]," which corroborates Jones's prospective testimony.

*Id.* (emphasis added; second alteration in original) (internal footnote omitted). Thus, although the Court explicitly declined to make a "credibility determination," it nonetheless appears from this passage that it did undergo a type of credibility assessment.

38

In light of the foregoing, the Court concluded: "If a jury finds Jones's testimony to be credible . . . the jury is likely to have a reasonable doubt as to whether Kelly possessed the gun at issue during the early hours of May 1, 2004 at Café Breezes. Thus, Kelly has established that the newly discovered evidence is likely to produce an acquittal." *Id.* (internal citation omitted).

On appeal, the Government argues that the District Court erred as a matter of law in refusing to make a credibility determination in regard to Jones's testimony, leaving such a determination to the jury at a new trial. (Appellant's Br. 30.) According to the Government, "[h]ad the district court made a credibility finding, the district court should have found that the Jones testimony was entitled to little, if any, probative weight." (*Id*. at 30-31.)

Kelly responds that, although he agrees "in the context of newly discovery [sic] evidence motions, it is for the district court to assess the credibility of the evidence,"[13] this does not mean that a district court must find the evidence to be "*in fact* credible." (Appellee's Br. 23.) In his view, "unless the district court discredits the new testimony, the standard itself and common sense suggest that the district court should do nothing

---

[13]*See also* Appellee's Br. at 22 ("Clearly, if a district court finds newly discovered testimonial evidence not credible, then it would not be an abuse of discretion to deny a new trial.").

more than assess whether a jury probably would reach a different result upon hearing the testimony." (*Id.* at 22.) To this end, Kelly asserts that the District Court "did in fact make a credibility determination with respect to Jones' [sic] testimony" (*id.*), as it specifically found that "'a jury is likely to find Jones's prospective testimony credible'" (*id.* (quoting Dist. Ct. Op. at *14)). According to Kelly, although the Government "goes to great lengths to argue that the district court abused its discretion for not discrediting Jones' [sic] testimony[, t]he district court's factual findings cannot be disturbed." (*Id.* 23.)

In light of the District Court's opinion and the parties' arguments, two issues require our attention, both of which arise in the context of a district court's inquiry into whether a defendant's newly discovered evidence would "probably produce an acquittal" at a new trial: (1) whether a district court is required to make a determination as to the credibility of the proffered evidence; and (2) if so, how is such a determination to be made? We address each of these issues in turn.

First, to be clear, "[i]t is the job of the district court, either on affidavits or after an evidentiary hearing . . . to decide whether the newly discovered evidence is credible, and, if so, whether it would probably produce an acquittal if a new trial were held." *United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997) (internal citation omitted); *see also United States v. Woolfolk*, 197 F.3d 900, 905 (7th Cir. 1999) ("The purpose of the evidentiary hearing was for the district court to assess the

40

credibility of the new witness and to determine the materiality of her testimony."). While it appears that all of the circuits to address this issue are in agreement, we find the Tenth Circuit's opinion in *United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006), to be particularly instructive.

In *McCullough*, four months after the defendant was convicted by a jury on various drug- and weapons-related charges, he sent a letter to the district court stating that he had discovered evidence that five of the Government's cooperating witnesses had conspired to provide false testimony against him and his co-defendant at trial. *Id.* at 1165-66. The defendant attached to his letter the written statements of nine inmates from his correctional facility. *Id.* at 1166. These statements indicated, *inter alia*, that the inmates had overheard the five cooperating witnesses, who were also inmates, conspiring to provide false testimony at trial in order to receive downward departures in their sentences. The statements also alleged that the cooperating witnesses had offered to sell information about the defendant's case to other inmates, so that they too could become government cooperators eligible for downward departures. *Id.* The defendant later filed a formal Rule 33 motion through counsel based on the inmates' written statements. *Id.*

After a multi-day evidentiary hearing, during which six of the nine inmates and all five of the cooperating witnesses provided live testimony, the district court denied the defendant's

motion. *Id.* In doing so, the district court noted that it did not find the inmates' testimony to be worthy of belief and set forth several reasons why the testimony was not credible. The district court ultimately found that, although the defendant had satisfied the first four prongs of the Tenth Circuit's *Iannelli* equivalent, he could not satisfy the fifth prong of the test. Though the district court agreed that the new evidence, "if believed, would probably produce an acquittal," it expressly found that the new evidence was not credible and denied the defendant's motion. *Id.* (internal quotation marks omitted). On appeal, the defendant argued that the district court erred in making a credibility determination. According to the defendant, a jury should have made the credibility judgment, not the judge. *Id.* at 1167.

The Tenth Circuit soundly rejected the defendant's argument, stating:

> [The defendant] effectively argues, without any citation to supporting authority, that the district court was required to accept his proffered evidence as true, order a new trial, and allow a new jury to determine whether the proffered evidence was credible. Neither the case law from this circuit, nor for that matter the case law from any other circuit, supports such a position. To the contrary, our five-pronged test . . . clearly implies that the district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether

the defendant's proffered "new evidence" is credible.

*Id.* The court added that the defendant's position was "patently absurd," as "it would allow a defendant to automatically obtain a new trial, and thereby undermine the time and resources devoted to the initial trial, simply by manufacturing some type of 'newly discovered evidence,' no matter how incredible such new evidence might be." *Id.* at 1167-68.

The defendant's position in *McCollough* appears to be similar to the position taken by the District Court in this case and by the district court in *Morales*. Both courts refused to make a finding of fact as to the credibility of the evidence before them, each believing that a defendant is entitled to have a jury evaluate the credibility of his newly discovered evidence. But, as *McCollough* makes clear, "the district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible." *Id.* at 1167. A district court that fails to exercise its discretion in this regard, abuses that discretion and is thus subject to reversal on appeal.

Having established that a district court is required to make a credibility determination as part of its probability-of-acquittal inquiry, we next address the proper standard for making such a determination. Kelly suggests that a district court's focus should be on whether a jury probably would reach

43

a different result upon hearing the new evidence. We agree. As the Eighth Circuit stated in *United States v. Grey Bear*, "[t]he real question we suppose, is not whether the district judge believed [the proffered testimony], but how likely the district judge thought a jury at a second trial would be to believe it."[14] 116 F.3d at 350. To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial. *See United States v. Woolfolk*, 197 F.3d 900 (7th Cir. 1999) ("The judge[,] in determining credibility, . . . must look to all aspects of the witness including not only her testimony but the evidence presented at trial.").

In this case, even though the District Court explicitly declined to "make . . . a credibility determination," believing

---

[14]The Eighth Circuit recognized, as do we, that this standard most likely establishes a distinction without a difference, in that "if a district court does not believe a witness, it seems most unlikely that the same court would find the witness sufficiently persuasive to enable the court to say that the witness's testimony would probably produce an acquittal at a new trial." *Grey Bear*, 116 F.3d at 351. Accordingly, a district court's statement that newly discovered evidence "is not credible," for example, is perfectly acceptable as long as the court sets forth its reasoning.

44

that "the jury is the appropriate fact-finder," Dist. Ct. Op. at *12, the Court nonetheless concluded that "a jury is likely to find Jones's prospective testimony credible" and set forth four reasons it thought this was so.[15] Thus, it appears that the District Court may have made a credibility determination after all. Though we assume that this determination took into account, at the very least, the other testimony presented at the Court's June 8, 2006 evidentiary hearing, we cannot be certain that the District Court weighed Jones's testimony against the testimony presented at Kelly's first trial. As the Government points out, Jones's testimony is contradicted at various points by the testimony of, among others, Officer Stewart. For instance, it would seem that one could not believe Jones's testimony that he threw the gun to the floor without also disbelieving Officer Stewart's testimony that she saw the gun fall from Kelly's lap. While the District Court does not address this seeming inconsistency, or others that appear in the record,[16] the Court

---

[15]Although the District Court in this case purported to apply the "*Morales* approach," it appears to us that, in actuality, the Court followed the approach taken by the Eight Circuit in *Grey Bear*. In *Morales*, the district court did not set forth any reasons why a jury would likely find the defendant's newly discovered evidence to be credible.

[16]For example, Jones testified that just before the uniformed police officers entered Café Breezes, all of the bar seats were

(continued...)

45

was required to take them into consideration. We cannot tell whether it did so; and, at the very least, the credibility

<hr/>

[16](...continued)
filled (there were 15), "there were people standing in between the seats," and "there were people standing behind [him]" (App. 370). According to Jones, "people were bumping into me all night, it was pretty tight." (App. 372.) But Corporal Drummond testified that there was a *total* of 8 to 10 people in the bar when the officers and inspectors entered, and Officer Clark, who was seated to Jones's immediate left, testified that there was no one standing behind either him or Jones at the time. Jones also testified that when he brushed the gun off his lap, it fell in front of him, slightly to his left. This would mean that the gun fell around the corner of the bar from where Kelly was sitting, to Kelly's right. However, Officer Stewart specifically testified that she saw the gun fall to the floor along Kelly's *left* leg.

We also note the inconsistency between Gant's post-trial affidavit, which Kelly submitted to the Court in support of his motion for a new trial, and Jones's hearing testimony. According to Gant's affidavit, Jones told Gant that, when the police entered Café Breezes the morning of May 1, 2004, "he got nervous and threw [the gun] down on the floor." (App. 424.) At the evidentiary hearing, however, Jones explicitly denied ever telling Gant that he threw the gun because he was nervous when the police appeared. These are only a few examples of inconsistencies that appear in the record.

46

assessment that the Court did make seems incomplete. Had Kelly met his burden of establishing the first four prongs of *Iannelli*, we would remand to the District Court for further clarification. However, because he has not satisfied *Iannelli*'s diligence requirement, we need not do so. We merely note that a credibility assessment is required as part of *Iannelli*'s probability-of-acquittal analysis, and it should take into account all of the evidence that a jury would be likely to hear and consider were the defendant granted a new trial.

## CONCLUSION

For the foregoing reasons, we will REVERSE the order of the District Court granting Kelly's motion for a new trial and REMAND for the entry of a judgment of conviction and for sentencing.

_____