**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2042
_____

UNITED STATES OF AMERICA

v.

ISA NOEL,
                    Appellant
_____

On Appeal from the District Court
of the Virgin Islands
(D.V.I. No. 3:13-cr-00031-002)
Honorable Curtis V. Gomez, U.S. District Judge
_____

Argued: May 22, 2018

Before: KRAUSE, ROTH, and FISHER, *Circuit Judges*

(Opinion Filed: September 26, 2018)

Joycelyn Hewlett
Meredith J. Edwards   [Argued]
Nelson L. Jones
Office of United States Attorney

5500 Veterans Drive, Suite 260
United States Courthouse
St. Thomas, VI 00802

> *Counsel for Plaintiff-Appellee United States of America*

Alvin E. Entin
Entin & Della Fera, P.A.
633 South Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301

John R. Howes   [Argued]
633 South Andrews Avenue
Fort Lauderdale, FL 33301

> *Counsel for Defendant-Appellant Isa Noel*

———————————

## OPINION OF THE COURT
———————————

KRAUSE, *Circuit Judge*.

Chief among several questions presented by this criminal appeal is what showing a defendant must make to warrant an evidentiary hearing when moving for a new trial on the ground of newly discovered evidence of juror misconduct. We are also called upon to consider the extent to which the Confrontation Clause entitles a defendant to cross-examine government witnesses who testify pursuant to cooperation agreements about the sentence reductions they

expect to receive in exchange. Because we conclude that the Defendant's new trial motion did not make the requisite showing to warrant a hearing and that the District Court's limitation on cross-examination did not contravene the Confrontation Clause, we will affirm.

## I. Background

This appeal arises from a drug trafficking conspiracy in which several personnel at a Virgin Islands airport smuggled cocaine onto commercial flights bound for the United States mainland. In August 2013, a federal grand jury returned an indictment charging Appellant Isa Noel, a ground services supervisor at St. Thomas's Cyril E. King Airport, and three of his fellow airport personnel with conspiracy to possess with intent to distribute cocaine and related possession offenses. After a three-day trial, the jury convicted Noel on all charges, and the District Court sentenced him to 151 months' imprisonment. More than a year later, Noel filed a motion for a new trial on the ground of newly discovered evidence of juror misconduct, which the District Court denied without a hearing.

Noel timely appealed,[1] challenging numerous orders across various stages of the proceedings but focusing

---

[1] After appealing from his convictions and sentence, Noel filed his new trial motion. We remanded to the District Court, which entered an order denying the motion. *See* Fed. R. App. P. 27; 3d Cir. L.A.R. 27.4. Seeking to appeal that order as well, Noel filed a motion to recall the mandate and for leave to file supplemental briefing. We granted that motion and now address both the merits of Noel's original

primarily on the sufficiency of the evidence, the District Court's rulings on cross-examination, and its denial of his motion for a new trial. Before turning to the merits, we recount the proceedings pertinent to the challenged orders.

### A. The Trial

#### 1. *Jury Selection*

During the preliminary proceedings, the District Court conducted *voir dire* and, over Noel's objection, impaneled a security officer working on a contract basis for the U.S. Marshals Service. In response to the District Court's questioning, that officer—who later became Juror No. 11—denied having a relationship by "blood, marriage[,] or business" with Noel or having "read or heard anything about th[e] case." App. 66–67. But when the District Court asked whether any juror was "involved in the criminal justice system," Juror No. 11 indicated that he was, which led to the following exchange:

> THE COURT: Okay. You raised your card . . . . Tell us why.
>
> JUROR MEMBER: I worked 26 years as a correction[s] officer and I [have] been involved in making the arrests and support and all that stuff.

appeal and the denial of his new trial motion. *See* 3d Cir. I.O.P. 7.2.

4

> THE COURT: Were you involved in any arrest in this case?
>
> JUROR MEMBER: No.
>
> THE COURT: All right. You're currently employed by whom?
>
> JUROR MEMBER: I'm retired now but I have a contract with the U.S. [M]arshal[]s office.

App. 76–77. Although it elicited assurances that Juror No. 11 could follow its instructions and remain impartial, the District Court did not inquire further into the juror's specific duties with the U.S. Marshals Service, nor did Noel.

Instead, citing the juror's involvement "in law enforcement . . . [p]roviding security," Noel moved to strike him from the jury. App. 78. After soliciting the Government's position—that the juror "indicated he had no dealings with the[] particular defendants in th[e] case," App. 78—the District Court denied Noel's motion; Juror No. 11 was impaneled; and the parties proceeded to trial.

### 2. *The Evidence*

Over the course of the trial, the Government presented the testimony of Noel's three former codefendants—Edisson Peguero Ortiz, Joelvis Acosta Liz (Acosta), and Kirsten Alexander—who had each since entered into plea agreements with the Government. The Government also offered the testimony of an additional cooperating witness and several law enforcement officers as well as phone records, airport

5

surveillance footage, physical evidence, and a joint stipulation to the amount of cocaine seized by law enforcement.

Ortiz and Acosta testified that they were involved in a cocaine distribution venture with Noel and that, as many as nine times, they received cocaine from a third party, facilitated its transportation through the airport into the baggage of ticketed passengers, and split the profits. Noel's role, they testified, was critical: As a ground services supervisor, he had access to restricted doors, allowing them to bypass TSA checkpoints. Their testimony was corroborated by a confidential informant and his law enforcement handler. The informant testified that, during a meeting at Acosta's house, Acosta and Noel agreed to transport cocaine for him and that he twice gave them sham cocaine outside the airport, which was then returned to him inside the airport. The handler, who surveilled the meetings and provided the sham cocaine, confirmed these facts.

In addition to this evidence about the conspiracy's structure and purpose, the jury heard about the particular transactions underlying Noel's two possession charges. The first transaction, Ortiz and Acosta testified, involved a foiled attempt to transfer six kilos of cocaine to a courier. Ortiz gave the cocaine to Noel the night before, and Acosta and Noel transported it, concealed in their waistbands, from the employee locker room to the airport bathroom where they were met by the courier. A surveilling law enforcement officer testified that he "pursued" the courier to "the handicap stall," "climbed on the toilet next door and looked over," and ultimately discovered the courier "standing in front of the toilet . . . on the phone," with a "black[] suitcase sitting on the toilet," "unzipped but not open." Second Addendum to App.

6

(Addendum) 373–74. Inside that suitcase the law enforcement officer found several brick-shaped packages, which the Government introduced as evidence and which the parties stipulated amounted to approximately seven kilos of cocaine.[2] The Government's evidence also included airport surveillance footage that showed Acosta, Noel, and the courier walking to and from the bathroom in succession and phone records that reflected eighty-one calls made that day between Ortiz, Acosta, and a phone number that, although subscribed in a different name, the Government asked the jury to infer, "us[ing] [its] common sense," was used by Noel. Addendum 510.

The second transaction took a similar form but went a step further before also being thwarted. In that instance, according to the testimony of codefendant Alexander, Alexander was at work at the airport in the employee break room when Noel, his supervisor, called him on the phone. Noel then came to the break room, asked Alexander to "take a package to one his friends . . . in the bathroom" inside the airport, and gave him access to do so through a restricted door. Addendum 126.

The "friend," a courier who testified as a cooperating witness for the Government, explained that he received the cocaine from Alexander in a bathroom stall and then boarded a plane to Miami, and surveillance footage showed the pair walking to and from the bathroom. The transaction was also

---

[2] Although Ortiz and Acosta estimated that the cocaine weighed six kilos, a lab analysis reflected a heavier weight to which the parties stipulated.

corroborated by phone records reflecting twelve calls made that day between Alexander and the same phone number used in the first transaction, as well as the testimony of a Homeland Security agent who described the courier as "appear[ing] visibly nervous" and "sweating profusely" after disembarking the plane in Miami. Addendum 147. Upon the courier's arrest, agents recovered from his luggage a brick-shaped package that the parties eventually stipulated amounted to about one kilo of cocaine and that was also introduced as a government exhibit.

### 3. *Cross-Examination Rulings*

Because codefendants Ortiz, Acosta, and Alexander each testified pursuant to cooperation agreements with the Government, Noel attempted to undermine their credibility by cross-examining them about the sentence reductions they hoped to receive in exchange. The District Court allowed some, but not all of the lines of questioning that Noel sought to pursue.

On the one hand, the District Court permitted each codefendant to confirm, in broad strokes, the benefits secured by their agreements. Noel was able to question the codefendants about the reduction of otherwise substantial sentences, the Government's agreement to drop or not pursue additional charges,[3] the codefendants' release from federal

---

[3] Acosta pleaded guilty to a conspiracy charge as to seven kilos, despite personally possessing thirty-two, and the Government dropped a possession charge; Alexander pleaded guilty to misprision of a felony, and the Government dropped a conspiracy charge; and Ortiz pleaded guilty to conspiracy—

custody pending sentencing, and the possibility of a greater sentence reduction, should their testimony be satisfactory. In addition, each of the codefendants disclosed that they had reviewed the Government's case against Noel prior to trial.

On the other hand, the District Court foreclosed inquiry as to the codefendants' precise sentencing exposure, explaining that this limitation was necessary to prevent the jury from inferring the sentence Noel himself was facing:

> Punishment is not ever something the jury is to have in their mind, so I'm not going to permit you to go into anything that gives some specific outline about what a sentence might be. The defendant is on trial for a drug conspiracy, and this defendant pled guilty to a drug conspiracy. . . . . Now, if you want to suggest that he was . . . exposed to . . . a considerable amount of time, and he is, by his performance today he is essentially singing for his supper, you can certainly explore that. But I'm not going to have you go into things like mandatory or specific sentences like 10 years or maximum of life . . . . Because if it's going into anything that deals with sentence or punishment, I don't want the jury to be connecting up the dots and say: Well, here's what Mr. Noel is facing.

Addendum 24–25.

---

the only charge for which he was indicted—but the Government agreed to reduce his exposure from about ten kilos to seven.

When it came time for closing arguments, Noel used the testimony he had elicited to impugn the codefendants' veracity and motivation for testifying. He described them, for example, as "self-confessed crooks, liars, [and] convicts . . . looking out for the best interests of only themselves," and urged the jury to discredit their testimony because they had "one goal"—to "serve[] less jail time"—and their eyes were on the "golden trophy": a recommendation from the Government "to reduce their substantial sentence[s] even further." Addendum 485–86.

The jury deliberated for about four hours before reaching a guilty verdict on all counts.

### B. The New Trial Motion

More than eighteen months after his convictions, Noel, alleging that he had recently discovered evidence of "significant juror misconduct," filed a motion for a new trial. App. 32. That motion explained that Noel had recently subpoenaed records from the U.S. Marshals Service, including a job description and time sheets that, according to Noel, cast doubt on the veracity of Juror 11's responses at *voir dire*. The job description revealed that Juror No. 11 served as a "District Security Officer" responsible for, among other tasks, guarding federal detainees and transporting them to and from court. App. 51. The time sheets also indicated, without any further detail, that Juror No. 11 worked "in court with prisoners" on the date of Noel's and two codefendants' preliminary appearances and that he provided "support to the airlift" the following day and on the day another codefendant was arraigned. App. 59, 61 (capitalization omitted). Based

10

on those records, Noel hypothesized that Juror No. 11 attended and transported Noel and his codefendants to and from those appearances and may have provided their transportation to other court proceedings. Failing to disclose that information on *voir dire*, Noel asserted, reflected material dishonesty by Juror No. 11 and deprived Noel of the right to an impartial jury.

The District Court was unconvinced. Going so far as to "[a]ssum[e] that Juror No. 11 interacted with Noel while Juror No. 11 worked as a contract employee with the United States Marshals," the District Court identified three pertinent *voir dire* questions that Juror No. 11 may have answered incorrectly: (1) whether he had a prior relationship with the defendant; (2) whether he had read or heard anything about the case; and (3) whether he had been involved in any arrest in the case. Suppl. App. 34. It reasoned, however, that because the juror "freely admitted" that he worked for the Marshals Service and Noel did not recognize the juror at trial, Juror No. 11 likely "did not recognize Noel either," rendering his answers "even if incorrect," still "honest[] respon[ses] to the Court's inquiries." Suppl. App. 33–34. The District Court therefore denied the new trial motion without a hearing, and this appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. We review for abuse of discretion the District Court's decision to deny a new trial motion, *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006), and to limit cross-examination, *United States v. Ellis*, 156 F.3d 493,

11

498 (3d Cir. 1998), exercising plenary review where that discretion turns on the scope of the Confrontation Clause, *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998). We review the sufficiency of the evidence "from the perspective of a reasonable juror," upholding the verdict "as long as it does not 'fall below the threshold of bare rationality.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (per curiam)).

## III. Discussion

Noel makes three principal arguments on appeal: (A) that the District Court's limitation on the cross-examination of his codefendants violated his rights under the Confrontation Clause; (B) that the District Court abused its discretion in denying, without an evidentiary hearing, his new trial motion; and (C) that the evidence was insufficient to support the verdict. We address these issues in turn.[4]

---

[4] We will not address in detail two additional arguments raised in Noel's brief: (1) the introduction of certain phone records; and (2) his sentence, which Noel had argued should be vacated and remanded. Because the phone records were largely cumulative of abundant properly-admitted evidence, and counsel conceded at oral argument that they did not have "an overall bearing on the outcome of the trial," Oral Arg. at 40:16–40:21, *available at* http://www2.ca3.uscourts.gov/oralargument/audio/14-2042_USAv.Noel.mp3, their admission cannot constitute prejudicial error, *see United States v. Browne*, 834 F.3d 403, 416–17 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 695 (2017). As for his sentence, although Noel in his brief argued that we

### A.    The Cross-Examination Limitation

Noel contends that the District Court, by precluding cross-examination on the specific details of his codefendants' sentencing exposure, violated his rights under the Confrontation Clause.  However, because the District Court did permit cross-examination in more general terms about the codefendants' sentencing reductions and other benefits of cooperation, and we are persuaded that this information was "sufficient . . . , without the excluded evidence, to make a discriminating appraisal of the possible biases and motivation of the witness[]," we perceive no error, much less constitutional error, in the limitation on cross-examination in this case.  *United States v. Chandler*, 326 F.3d 210, 219 (3d Cir. 2010) (quoting *Brown v. Powell*, 975 F.2d 1, 4 (1st Cir. 1992)).

The Confrontation Clause guarantees a criminal defendant the right to "be confronted with the witnesses against him."  U.S. Const. Amend. VI.  Primary among those rights is "the right of cross-examination," which may include questions "directed toward revealing possible biases, prejudices, or ulterior motives of the witness."  *Davis v.*

should vacate and remand for resentencing in light of an intervening amendment to the Sentencing Guidelines, counsel conceded at argument that Noel already "got the benefit" of that amendment.  Oral Arg. at 41:21–41:24.  And wisely so, because the District Court, anticipating its future adoption, sentenced Noel in accordance with the amendment.  Both of these arguments thus lack support in the record and were essentially withdrawn by Noel.

*Alaska*, 415 U.S. 308, 315–16 (1974) (citations omitted). Despite this guarantee, trial judges retain "wide latitude . . . to impose reasonable limits on . . . cross examination," which a defendant may overcome by showing that, had the proposed line of inquiry been permitted, the jury "might have received a significantly different impression of [the witness's] credibility." *Delaware v. Van Arsdall*, 475 U.S. 673, 679–80 (1986).

In light of these principles, in *United States v. Chandler*, we derived from *Van Arsdall* a two-part test to determine whether a particular limitation on cross-examination violated a defendant's rights under the Confrontation Clause. 326 F.3d at 219. First, we determine whether the limitation "significantly inhibited [the defendant's] effective exercise of her right to inquire into [the] witness's 'motivation in testifying.'" *Id.* (quoting *Van Arsdall*, 475 U.S. at 678–79). Then, if it did, we ask whether the limitation fell within "those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish." *Id.* Whether the trial court abused its discretion, we explained, "depends on whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivation of the witness[]," *id.* (citation omitted), or, conversely, whether without the limitation, "a reasonable jury could have 'reached a significantly different impression' of [the witness's] credibility," *id.* at 222 (quoting *Van Arsdall*, 475 U.S. at 680).

On the facts of *Chandler*, we concluded that the district court's limitation violated the Confrontation Clause. There, the trial court allowed a witness to testify that he

14

pleaded guilty to carrying a smaller amount of drugs than he had actually carried and that he received only one month of house arrest plus probation even though the offense to which he pleaded guilty carried a possible twelve to eighteen-month sentence. *Id.* at 221–22. But the trial court did not permit testimony that, had the witness not cooperated with the Government, he may have faced "more than eight years in prison." *Id.* at 222. Considering the extent of that discrepancy, we held that "the limited nature of [the witness's] acknowledgment that he had benefited from his cooperation made that acknowledgment insufficient for a jury to appreciate the strength of his incentive to provide testimony that was satisfactory to the prosecution." *Id.* At the same time, we were careful not to resolve "whether the Confrontation Clause entitles a defendant categorically to inquire into the 'concrete terms' of a cooperating witness's agreement with the [G]overnment, including the specific sentence that witness may have avoided through his cooperation." *Id.* at 221.

Two years later, in *United States v. Mussare*, we explicitly "decline[d] to . . . hold" that "such a categorical right exists." 405 F.3d 161, 170 (3d Cir. 2005). Because there, the trial court permitted extensive testimony regarding the plea agreement—including that the witness "expected to have all federal charges against him dismissed, face only state charges, and receive no jail time" and that "absent his cooperation, [the witness] would [have been] facing the exact same charges as [the defendants]"—we concluded that "the actual number of years in jail that [the witness] would otherwise have faced was not likely to have altered the jury's impression of his motive for testifying." *Id.*

15

And more recently in *United States v. John-Baptiste*, where the district court had "allowed testimony regarding the witnesses' agreements to cooperate with the [G]overnment and the fact that they expected to receive more lenient sentences in return," we likewise concluded that its exclusion of testimony about "specific sentences that could have been imposed if the witnesses had refused to cooperate—a line of questioning that we have allowed trial courts to curtail"—was not likely to have altered the jury's impression of credibility. 747 F.3d 186, 212 (3d Cir. 2014) (emphasis omitted).

Together, these cases hold that there is no absolute right to inquire into the precise sentence a government witness might face absent his cooperation and that a district court may limit the scope of cross-examination to more general inquiries about his expected benefits. Such limitation is permissible under the Confrontation Clause unless "the jury might have 'received a significantly different impression of [the witness's] credibility'" had it not been imposed, which we assess using *Chandler*'s two-part test. 326 F.3d at 219. If the reviewing court determines that the jury indeed might have received a significantly different impression of the witness's credibility, the trial court has necessarily exceeded the "'reasonable limits' which [it], in due exercise of its discretion, has authority to establish." *Id.* at 219.[5]

_____

[5] As we make clear today, the question whether a reasonable jury "might have received a significantly different impression of [the witness's] credibility," *Van Arsdall*, 475 U.S. at 680, pertains at the second step of the *Chandler* inquiry, i.e., whether the limitation fell within the bounds of the trial court's discretion, not at the first step, i.e., whether

16

Here, the limitation imposed by the District Court fell comfortably within constitutional bounds.  As in *Mussare* and *John-Baptiste*, the District Court imposed a single narrow restriction:  It instructed defense counsel not to "go into

the limitation "significantly inhibited" the defendant's right to inquiry into the witness's motivation for testifying.  Our precedent has not always been so clear on this point.  *Compare, e.g.*, *Chandler* 326 F.3d at 219 (explaining that the question whether a reasonable jury might have received a different impression of the witness's credibility equates to "[w]hether a trial court has abused its discretion"), *with id.* at 223 (proceeding, even after having concluded "a reasonable jury could have 'reached a significantly different impression' of [the witness's] credibility," to inquire whether the limitation "nevertheless fell within the District Court's discretion"), *and Mussare*, 405 F.3d at 169 (interpreting *Chandler* to mean "that the proper inquiry under the first prong [i]s 'whether . . . the jury might have received a significantly different impression of [the witness's] credibility").  However, once a defendant "show[s] that . . . [a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination," he already has "state[d] a violation of the Confrontation Clause."  *Van Arsdall*, 475 U.S. at 680.  Thus, it would hardly make sense to ask at that point whether the limitation "nevertheless fell within the District Court's discretion," Chandler 326 F.3d at 223, for the bounds of a trial court's discretion, broad as they may be, do not exceed those of the Constitution.

things like mandatory or specific sentences like 10 years or maximum of life, fines, or any of that sort of stuff." Addendum 24. But it expressly permitted counsel to explore the codefendants' agreements with the Government, to elicit that they were "exposed to . . . a considerable amount of time," and to suggest that, "by [their] performance today [they are] essentially singing for [their] supper." Addendum 24. Noel's counsel did just that, eliciting from Ortiz, Acosta, and Alexander[6] that the Government agreed to drop charges or significantly limit liability under existing charges, to release them from custody pending sentencing, and, as to Ortiz and Acosta, to refrain from bringing additional charges. And that testimony was sufficient for counsel to argue in closing that the codefendants were "self-confessed crooks, liars, [and] convicts" who had "one goal," to serve less jail time, and would say anything to win the "golden trophy" of a recommendation "to reduce their substantial sentence[s] even further." App. 485–86.

In short, even assuming the District Court's limitation "significantly inhibited" Noel's exercise of his right to probe the codefendants' "motivation in testifying," *Chandler*, 326 F.3d at 219, we cannot say on this record that the line of inquiry barred by that limitation might have given the jury a "significantly different impression of [the codefendants'] credibility," *id.* at 221 (quoting *Van Arsdall*, 475 U.S. at 680).

---

[6] A fourth witness, Alan Pacquette, the courier who had been detained since his arrest in Miami, denied testifying pursuant to a cooperation agreement or in hope of a sentence reduction.

18

The limitation therefore did not violate the Confrontation Clause.

### B. Denial of the New Trial Motion

Noel next contends that the District Court abused its discretion by denying, without a hearing, his motion for a new trial on the ground of newly discovered evidence of juror misconduct—namely, that Juror No. 11 allegedly provided false *voir dire* responses in view of the time sheets reflecting his work "in court with prisoners" and providing "support to the airlift" on dates when Noel or his codefendants had court proceedings. App. 59, 61 (capitalization omitted). To prevail on a motion for a new trial, the defendant must file the motion within fourteen days of the verdict unless the motion is grounded on "newly discovered evidence" and he must show that a new trial is in the interest of justice. Fed. R. Crim. P. 33. But the decision whether to grant a new trial or a hearing on that motion rests in the district court's discretion.[7]

---

[7] We have long recognized that the broad bounds of a district court's discretion over a new trial motion encompass the determination whether an evidentiary hearing is necessary. *See United States v. Herman*, 614 F.2d 369, 372 (3d Cir. 1980); *United States v. Iannelli*, 528 F.2d 1290, 1294 (3d Cir. 1976); *accord United States v. Slatten*, 865 F.3d 767, 791–92 (D.C. Cir. 2017), *cert. denied sub nom. Slough v. United States*, 138 S. Ct. 1990 (2018). And appellate review of that broad discretion as to post-trial allegations of juror misconduct—"[i]n contrast to allegations . . . made *during* a trial," *United States v. Fumo*, 655 F.3d 288, 306 (3d Cir. 2011) (emphasis in original)—is particularly curtailed. Although "a call for a hearing has an inherently reasonable

19

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Where, as here, the motion is premised on an allegation of juror misconduct that was "newly discovered" more than a year after the verdict and the defendant contends he is entitled to a hearing on that motion, he must show both (1) that the evidence was indeed "newly discovered," and (2) that it meets the standard we have set for a defendant to show that a "specific, nonspeculative impropriety has occurred." *United States v. Claxton*, 766 F.3d 280, 301 (3d Cir. 2014) (citation omitted). If both of these criteria are satisfied, a district court's denial of the motion for a new trial without a hearing will be considered an abuse of discretion. Here, however, Noel has satisfied neither.

---

ring to it," *United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991), one that would recall discharged jurors strikes a more discordant note. "It is qualitatively a different thing to conduct a *voir dire* during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose." *Id.* at 98 (italics added). In view of this distinction, courts "are always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias [or] misconduct." *Fumo*, 655 F.3d at 306 (quoting *Gilsenan*, 949 F.2d at 97); *accord United States v. Cornelius*, 696 F.3d 1307, 1324–25 (10th Cir. 2012); *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006).

20

*1.    No Hearing Was Warranted Because the Evidence Cannot be Deemed "Newly Discovered"*

First, Noel was not entitled to a hearing because the motion was not grounded on "newly discovered" evidence. "The test to determine whether evidence is 'newly discovered' is both objective and subjective . . . ." *Cimera*, 459 F.3d at 461. "Evidence is not 'newly discovered' if it 'was [actually] known or could have been known by the diligence of the defendant or his counsel.'" *Id.* (alteration in original) (quoting *United States v. Bujese*, 371 F.2d 120, 125 (3d Cir. 1967)); *accord United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir. 1993). Only the objective element of that test is at issue here, because the Government does not contend that Noel, at trial, was subjectively aware of the evidence pertaining to Juror No. 11's job duties. The question, then, is whether this evidence would have been promptly investigated and discovered by reasonably diligent counsel given the juror's disclosure of his employment with the U.S. Marshals Service.

Diligence is a "relative term" that typically "depends on the circumstances of the case." *Cimera*, 459 F.3d at 461 (citation omitted). Time and again, we have confronted situations where we concluded that counsel's failure to make further inquiry did not constitute reasonable diligence, but we did not articulate a standard by which to judge when notice is sufficient to require such further inquiry. We do so today, for it cannot be that notice of any fact that could conceivably prompt further inquiry will defeat a finding of reasonable diligence, but without some benchmark, neither could we say with confidence how the notice measures up here. A brief

21

review of our precedent is instructive in deriving a workable standard.

In *United States v. Iannelli*, 528 F.2d 1290 (3d Cir. 1976), we held that defendants did not diligently pursue evidence that the authorization for court-ordered electronic surveillance, through which the Government had obtained much of its evidence against them, was fraudulent. *Id.* at 1291, 1293. Because "the matter of proper authorization was warmly contested" at trial and had the potential to render inadmissible evidence that was central to the prosecution, we reasoned that diligent counsel would have been prompted to "subject[] the initials to expert handwriting analysis" immediately, rather than waiting until after the defendants were convicted. *Id.* at 1293.

In *United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978), we concluded that a defendant was not diligent in obtaining statements from a witness who had appeared at trial but invoked his privilege against self-incrimination. *Id.* at 145, 148. Although the witness was "the other principal participant in the activities for which [the defendant] had been convicted" and thus could have potentially provided powerful exculpatory testimony, *id.* at 145, the defendant failed to "pursue [the] resolution" of the asserted privilege "as part of a sustained effort to compel [the witness's] testimony" at the time of trial, *id.* at 148. When the defendant then attempted, after his convictions, to introduce an affidavit from that witness as newly discovered evidence, we concluded that "the defense never discharged its responsibility to act diligently in procuring the evidence on which it [was] now seek[ing] to base its motion for a new trial." *Id.*

Next, in *United States v. Kelly*, 539 F.3d 172 (3d Cir. 2008), we concluded that a defendant who made no effort to procure an acquaintance's testimony in time for trial—notwithstanding that the acquaintance's presence at the defendant's arrest and potential ability to corroborate his version of events gave him "every reason" to do so—did not act diligently in discovering the acquaintance's later, exculpatory statement. *Id.* at 184. Although we recognized that the acquaintance may have been "unable[] or unwilling" to provide his testimony at trial, we rejected the notion that "potential or anticipated futility" excused the defendant from at least attempting to procure it given the realistic possibility that he could and the significance it held for the defense, concluding, "inaction simply does not qualify as reasonable diligence." *Id.* at 183–84.

Finally, in *United States v. Napolitan*, 762 F.3d 297 (3d Cir. 2014), we held that a defendant was not diligent in his alleged discovery that two witnesses at his trial had testified falsely. *Id.* at 307. We reasoned that the defense's limited inquiry of the witnesses while they were on the stand and failure "to ask even a single question" regarding the relevant statements did not justify the delay in discovering only post-conviction that those statements were false, particularly because the subject matter was "central to [the] defense." *Id.* at 306–07.

What we distill from these cases is that notice must rise above a certain threshold before a defendant will be faulted for failing to act with "reasonable diligence." After all, even the most zealous of counsel cannot be expected to inquire into every remote possibility and may reasonably prioritize the investigation of matters material to the defense

23

above those that seem peripheral. Instead, drawing on *Iannelli*, *Rocco*, *Kelly*, and *Napolitan*, we hold that to satisfy the diligence standard, counsel must conduct further inquiry once the circumstances alert her to the existence of additional information that has a reasonable possibility of proving material to the defense. And when the defense takes no action in the face of such notice, it has failed to "discharge[] its responsibility to act diligently in procuring the evidence on which it . . . seeks to base its motion for a new trial." *Rocco*, 587 F.2d at 148.

We note too that this standard, and the obligation it imposes on counsel, applies at *voir dire* no less than at trial. As "[o]ne touchstone of a fair trial is an impartial trier of fact," *McDonough*, 464 U.S. at 554, juror misconduct is highly material to the defense. And although "the obligation to impanel an impartial jury lies in the first instance with the trial judge," *United States v. Cunningham*, 694 F.3d 372, 393 (3d Cir. 2012) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981)), advocates have obligations of their own, *see McDonough*, 464 U.S. at 550 n.2 (recognizing that defendants "would be barred from later challenging the composition of the jury when they had chosen not to interrogate [a juror] further upon receiving an answer which they thought to be factually incorrect"). *See generally* ABA Standards for Criminal Justice: Prosecution and Defense Function 4–7.3(a), (f) (4th ed. 2015) (describing defense counsel's role in "discharg[ing] effectively the defense function in the selection of the jury," such as by "request[ing] specific follow-up questions during the selection process when necessary to ensure fair juror selection").

24

Of course, we would not fault a defendant for failing to inquire further into *voir dire* responses that raised no potentially material concerns at the time, yet later turned out to be demonstrably and materially false. *Cf. Williams v. Taylor*, 529 U.S. 420, 440–44 (2000) (explaining, in the habeas context, that a juror's deliberately misleading *voir dire* response excused counsel's failure to develop a juror bias claim in state court). But when the substance of a juror's *voir dire* responses suggest a reasonable possibility that additional information would substantiate a potential conflict or bias, the defense has the responsibility to inquire further.[8] It also has tools to do so at its disposal, including the ability either to "ask further questions that the court considers proper," Fed. R. Crim. P. 24(a)(2)(A), or to "submit further questions that the court may ask if it considers them proper," Fed. R. Crim. P. 24(a)(2)(B), or even to subpoena documents, Fed. R. Crim. P. 17. A juror's own failure to volunteer additional facts in that circumstance will "ha[ve] no bearing on the question of whether [the defendant] took affirmative steps to discover that testimony in the first instance." *Kelly*, 539 F.3d at 186. Rather, "the duty to conduct reasonable diligence," at *voir dire*—while perhaps differing in degree, though not in kind from the duty at trial—"lies with the defendant and his counsel." *Id.*

---

[8] As our colleagues on the Fourth Circuit have put it, defendants may not "sandbag the courts by accepting jurors onto the panel without exploring on *voir dire* their possible sources of bias and then, if their gambit failed and they were convicted, challenging their convictions by means of post-trial evidentiary hearings based on newly discovered evidence of possible juror bias." *Billings v. Polk*, 441 F.3d 238, 246 (4th Cir. 2006).

We turn, then, to the question whether Noel satisfied that responsibility in this case, and we conclude he did not. At *voir dire*, Juror No. 11 openly admitted that he had a decades-long career as a corrections officer and that he was working at the time for the U.S. Marshals Service. As that agency provided law enforcement and prisoner transportation services to the very courthouse in which the jury was being empaneled for trial, these disclosures alerted him that there was additional information available, such as supplemental *voir dire* responses, court records, and employment records that had a reasonable possibility of showing that Juror 11 had contact with Noel or his codefendants in the course of his job duties. Thus, even if Noel at that point "had no reason to know the exact substance of [Juror 11's] potential testimony, he had every reason to question [the juror] about [it]." *Id.* at 184. Indeed, Noel in effect conceded as much on appeal by acknowledging that what prompted him to seek out Juror 11's job description and time sheets eighteen months later was a "tip" that "this particular juror ha[d] a background in law enforcement," Oral Arg. at 10:23–10:27, 11:32–11:46—the very same information, that is, that he had in his possession at the time of *voir dire*.

In sum, Noel was on notice before Juror 11 was ever impaneled of the existence of additional information that had a reasonable possibility of proving material to the defense, and in that circumstance, "[s]itting on [his] hands and waiting" for the District Court sua sponte to inquire or for Juror No. 11 to spontaneously say more "cannot be considered—by any definition—reasonable diligence." *Kelly*, 539 F.3d at 186. Because Noel's motion was not filed on the

26

basis of "newly discovered" evidence, the District Court did not err in denying it without a hearing.

>    2.    *No Hearing Was Warranted for the Additional Reason That Noel's Evidence Was Insufficient*

Noel was not entitled to a hearing for the additional reason that he failed to meet the evidentiary standard we established in *United States v. Claxton* for showing that a "specific, nonspeculative impropriety has occurred."[9]    766

---

[9] Where a defendant alleges that a juror was dishonest at *voir dire*, the *ultimate* showing required, that is, the one that would warrant vacating the judgment and granting a new trial, is (1) that "a juror failed to answer honestly a material question on *voir dire*"; and (2) that "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556; *accord Warger v. Shauers*, 135 S. Ct. 521, 525 (2014).  That two-part test balances the right to an impartial jury against the countervailing interest of finality:  Although "[*v*]*oir dire* . . . serves to protect" the right to a "fair trial [by] an impartial trier of fact," and "the necessity of truthful answers . . . [to] this process . . . is obvious," "[t]o invalidate the result of a [lengthy] trial because of a juror's mistaken, though honest response" would undercut the "investment of private and social resources" and "the important end of finality."  *McDonough*, 464 U.S. at 554–55.  But Noel does not contend that his new trial motion, on its face, satisfied both *McDonough* prongs.  Rather, he argues that the District Court erred in denying that motion without holding an evidentiary hearing to verify his allegations that Juror No. 11 made false statements at *voir*

F.3d at 301 (citation omitted). In that case, we embraced the formulation in *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), and held that the defendant must show "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred" to warrant a hearing on a motion for new trial. *Claxton*, 766 F.3d at 301 (quoting *Stewart*, 433 F.3d at 302–03). But the evidence there "establish[ed] only that, at some unspecified time in the past, [the juror] worked with both a government and defense witness," and thus it "d[id] not indicate . . . any possible basis for bias beyond having shared a former employer" or "offer[] . . . more than speculation that [the juror] even knew the witnesses, much less that the juror was biased in the [G]overnment's favor." *Id.* We had little need, therefore, to scrutinize our formulation or to elaborate on the showing it requires. We have such occasion today.

As a threshold matter, we clarify, as has the Second Circuit, that the defense need not provide literally "incontrovertible" evidence of juror misconduct, *id.*, for if "[t]he requirements of 'strong, substantial and incontrovertible evidence' . . . demand[ed] that the allegations be irrebuttable[,] . . . there would be no need for a hearing." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

At the same time, the evidentiary standard for obtaining a hearing on a new trial motion is necessarily a high

---

*dire* and otherwise would have been discharged for cause. Thus, we focus here on the threshold showing required for a hearing.

28

one given the interests at stake. On the one hand, we have the "obvious" need for "truthful answers by prospective jurors" in impaneling "impartial trier[s] of fact," *McDonough*, 464 U.S. at 554, and the proper function of a hearing in this context, "to determine what happened, that is to establish the historical record," *United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991). On the other hand, due respect must be accorded a fully litigated jury trial—which involves "an important investment of private and social resources," *McDonough*, 464 U.S. at 555, implicates "the important end of finality," *id.*, and makes us "reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias," *United States v. Fumo*, 655 F.3d 288, 306 (3d Cir. 2011). Thus, while the evidence of juror misconduct need not be literally "incontrovertible" to warrant a hearing, it still must constitute "clear, strong, [and] substantial" evidence of a "specific, nonspeculative impropriety." *Claxton*, 766 F.3d at 301 (citation omitted).

That standard can be met in a variety of ways. *See, e.g.*, *United States v. Vitale*, 459 F.3d 190, 193–94, 199–200 (2d Cir. 2006) (involving attorney correspondence confessing previously undisclosed connections between a juror and the prosecution); *United States v. Boney*, 977 F.2d 624, 628, 632–35 (D.C. Cir. 1992) (involving a prosecution's investigation concluding that a juror lied at *voir dire* about a prior felony); *Ianniello*, 866 F.2d at 543 (involving juror affidavits "alleging specific acts of inappropriate conduct"). But conjecture is not among them: A district court does not abuse its discretion in denying a motion for a new trial without a hearing where the defendant "offers nothing more than

29

speculation" of juror misconduct.[10]  *Claxton*, 766 F.3d at 301; *accord United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992) (finding a hearing unnecessary on a motion "based on pure conjecture").

Ultimately, however, that is all Noel has offered here. To be sure, the records he eventually obtained show that Juror No. 11 was working at the courthouse on certain dates when Noel and his codefendants were transported or had court appearances and, thus, it is indeed *possible* that Juror No. 11 was assigned to their matters.  But Noel made no effort to substantiate that possibility, or even to raise it from possibility to probability.  While he could have sought to do so through a variety of means—for example, affidavits, *cf. Ianniello*, 866 F.2d at 543, or credible reports, *cf. Boney*, 977 F.2d at 632–35, or even his own attestation based on personal observations about the relative size of the courthouse, number of courtrooms, or number of court proceedings—he rested his motion instead on records showing only that Juror No. 11 was working on some of the same days that Noel and his co-defendants were processed and that they therefore *might* have crossed paths.

---

[10] Of course, there are also many other circumstances when a district court might forgo a hearing, such as where the motion is capable of resolution on the existing record, *e.g.*, *United States v. Richards*, 241 F.3d 335, 344 (3d Cir. 2001), grounded on evidence that is not newly discovered, *e.g.*, *id.* at 343; *United States v. Forbes*, 790 F.3d 403, 411 (2d Cir. 2015), or based on allegations that, even if true, would not lead to relief, *e.g.*, *Fumo*, 655 F.3d at 306–07; *Gilsenan*, 949 F.2d at 97.

And more to the point, none of those records constituted "clear, strong, [and] substantial" evidence of false *voir dire* responses, *Claxton*, 766 F.3d at 301 (citation omitted). In response to the District Court's inquiries, Juror No. 11 indicated that he did not (1) have a relationship with the defendant, (2) read or hear anything about the case, or (3) have any involvement with any arrest in the case. But the "newly discovered" job description and time sheets do not show that those responses were inaccurate, much less dishonest, and in the context of a motion that would undermine the finality of a jury verdict, the District Court was within its discretion to investigate no further.[11] Having presided over the *voir dire* proceeding, having observed the prospective jurors, and having reviewed the *voir dire* transcript and the purported "newly discovered evidence" on which Noel based his new trial motion, the District Court

---

[11] It is not unreasonable to think, as the District Court surmised, that even if Juror No. 11 did have contact with Noel or his codefendants, he either did not notice or did not recall by the time of trial, about four months later. But had there been objective evidence that the juror's responses were not accurate, such suppositions might not be sufficient to forgo a hearing. As the Second Circuit observed in *Stewart*, "if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held," 433 F.3d at 306, but "[t]he inquiry should end whenever it becomes apparent to the trial judge that reasonable grounds to suspect prejudicial jury impropriety do not exist," *id.* at 303 (citation omitted).

reasonably concluded that Noel had not produced the requisite "clear, strong, [and] substantial" evidence that a "specific, nonspeculative impropriety ha[d] occurred," *id.* (citation omitted), and we will defer to that finding in light of the District Court's "intimate familiarity with the facts of th[e] case," *Gov't of the V.I. v. Lima*, 774 F.2d 1245, 1251 (3d Cir. 1985).

\* \* \*

In sum, both because Noel failed to establish that his new trial motion was grounded on newly discovered evidence, that is, on evidence that could not have been discovered through counsel's reasonable diligence, and because he failed to produce "clear, strong, [and] substantial" evidence that a "specific, nonspeculative impropriety ha[d] occurred," *Claxton*, 766 F.3d at 301 (citation omitted), we conclude that the District Court did not abuse its discretion when it declined to hold a hearing and denied Noel's motion for a new trial.

## C.   Sufficiency of the Evidence

Finally, Noel's challenge to the sufficiency of the evidence is meritless.  As for the conspiracy charge, the Government amply demonstrated "(1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal." *Caraballo-Rodriguez*, 726 F.3d at 425.  Ortiz testified that he, Acosta, and Noel had an "agreement" to distribute cocaine for profit, Addendum 8, and Noel's codefendants testified to his essential role and the sharing of profits among the coconspirators. *See United States v. Gibbs*, 190 F.3d 188,

32

199–200 (3d Cir. 1999) (explaining that "repeated, familiar dealings" support the inference of a defendant's knowledge of her role in a larger operation).

Likewise, the trial record is replete with evidence supporting the substantive counts of possession with intent to distribute. On the first count, trial testimony established that Noel received six kilos of cocaine that he and Acosta transferred the next day from the employee locker room to a courier in the bathroom. As to the second, Alexander testified that, at Noel's direction, he delivered a package of cocaine to Noel's "friend," who then flew to Miami and was arrested after the cocaine was found in his luggage. That is to say nothing of the testimony of the confidential informant and law enforcement agents, as well as airport surveillance video footage, phone records, and the parties' stipulations to the amount of cocaine seized by law enforcement. In sum, "[t]he evidence was more than sufficient; it was overwhelming." *United States v. Burnett*, 773 F.3d 122, 135 (3d Cir. 2014).

## IV. Conclusion

For the foregoing reasons, we will affirm Noel's convictions and sentence.