NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3934
_____

UNITED STATES OF AMERICA

v.

PAUL W. BERGRIN,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cr-00369-001)
District Judge:  The Honorable Dennis M. Cavanaugh
_____

Submitted Under Third Circuit LAR 34.1(a)
November 19, 2014

Before:  SMITH, HARDIMAN and BARRY, *Circuit Judges*.

(Filed: December 18, 2014)
_____

OPINION*
_____

HARDIMAN, *Circuit Judge*.

Paul Bergrin appeals his judgment of conviction and sentence following a jury trial.

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Bergrin's downfall—which might have been the subject of a Sophocles tragedy in olden times or a Scorsese film these days—has been recounted by this Court twice before, and we need not do so a third time. *See United States v. Bergrin*, 682 F.3d 261 (3d Cir. 2012); *United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011). Bergrin raises three legal arguments in this appeal, two involving his trial and one challenging his sentence. First, Bergrin claims the District Court erred when it denied his motion for a judgment of acquittal on the counts related to the murder of Kemo McCray. Second, he contends that the Court denied him a fair trial. Finally, he argues that the Court erred when it denied his request for an evidentiary hearing and violated the Eighth Amendment when it imposed several concurrent terms of life imprisonment. We address each argument in turn.

I

Bergrin claims the Government did not adduce sufficient evidence to convict him on four counts related to McCray's murder. Considering the voluminous record as a whole and viewing the evidence in the light most favorable to the verdict winner, *see generally United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc), we agree with the District Court that a rational jury could have inferred that William Baskerville and Bergrin formed an agreement to murder McCray on November 25, 2003, and that soon thereafter Bergrin met with others in furtherance of that agreement.

The record is replete with evidence to support the Government's claim that Bergrin was "house counsel" to Hakeem Curry's drug-trafficking organization. In that capacity, Bergrin was retained to represent Curry's underlings to ensure that they did not cooperate

2

with authorities. One such underling was William Baskerville, who was arrested on November 25, 2003, for selling crack cocaine to a confidential witness. Baskerville deduced the identity of the confidential witness and disclosed it to his lawyer, Bergrin, who then called Curry to advise him that the witness was "K-Mo." Anthony Young, who was with Curry when he received Bergrin's call, recognized "K-Mo" as Kemo McCray. Soon thereafter, Bergrin met with Curry and several of his associates. According to Young, Bergrin told the group that Baskerville "was facing life in prison for that little bit of cocaine," App. 3281, and "if Kemo testify against Will, Will was never coming home. He said . . . don't let Mr. McCray . . . testify against Will, and if he don't testify, he'll make sure he gets Will out of jail," App. 3282. Bergrin repeated: "no Kemo, no case," a phrase he reiterated upon leaving the group while pointing his finger. App. 3282, 3283. A few months later, Young shot McCray to death.

Although the aforementioned excerpts from the record are enough to sustain Bergrin's convictions related to the McCray murder, there is much more. For example, Bergrin told another client that he would kill an informant named Junior and that "it wasn't his first time," App. 6855; *see also* App. 6853, which a rational juror could infer was a reference to the McCray murder. Rather than denying culpability, Bergrin boasted to his law partner, Thomas Moran, that the Government lacked evidence to convict him of McCray's murder, further supporting the same inference. Finally, the jury was allowed to infer that Bergrin had the ultimate motive to prevent McCray from testifying against Baskerville because, had Baskerville been incentivized to cooperate against Curry, the

3

Government might have "climbed the ladder" to Bergrin himself.

In sum, Bergrin fell well short of carrying his "very heavy burden," *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997), of establishing his right to a judgment of acquittal. The District Court did not err in this regard.

II

The lion's share of Bergrin's brief is devoted to his second argument, which asserts that the District Court denied him a fair trial. Under that general heading, Bergrin offers a congeries of objections to the manner in which the trial was conducted, including: (1) prejudicial rulings denying him a continuance, interfering with his opening and closing statements and witness examinations, denying funding for transcripts, and precluding defense witnesses; (2) preventing him from challenging the Government's case by authorizing the Government to make speaking objections, vouching for Government witnesses, denying him an opportunity to review key Government evidence, denying him access to exculpatory evidence, and curtailing his cross-examination of Government witnesses; and (3) erroneous evidentiary rulings. Proving the truth of Judge Aldisert's admonition that the number of claims raised in an appeal is usually inversely proportional to their merit, Ruggero J. Aldisert, *The Appellate Bar: Professional Responsibility and Professional Competence -- A View from the Jaundiced Eye of One Appellate Judge*, 11 Cap. U. L. Rev. 445, 458 (1982), our review of the extensive record leads us to conclude that Bergrin's scattershot arguments are exceedingly weak. In fact, the record reflects the precise opposite of what Bergrin claims: Judge Cavanaugh conducted this lengthy trial

with great skill, patience, and fairness. And he did so in spite of an obstreperous pro se Defendant who did whatever he could to: (1) delay the trial, (2) gratuitously attempt to plant the seeds of error, and (3) unfairly prejudice the jury by repeatedly offering inadmissible evidence despite the Court's perpetual warnings not to do so.

Rather than catalogue all that transpired in this eight-week trial, we focus on a few items that illustrate the inaccuracy and unpersuasiveness of Bergrin's argument. For example, Bergrin claims: "Specifically, time and again, the trial court explained *to the jury* that it believed that various government witnesses were being truthful despite discrepancies in their testimony[.]" Bergrin Br. 54 (citing, *e.g.*, App. 1441) (emphasis added). In truth, in at least one of the examples cited by Bergrin, Judge Cavanaugh was addressing the parties and counsel at sidebar, out of the jury's earshot. Bergrin claims that the judge told the jury that the "Government is moving its witnesses quickly," prejudicing him by implying that he was moving slowly. Bergrin Br. 53 (citing App. 7895). Although the Court did say that, just a few sentences earlier the Court commended both sides by saying that "the attorneys have really been working diligently to move this case along." App. 7894. Bergrin claims that the judge consistently undermined the credibility of defense witnesses, such as by repeatedly interrupting Bergrin's first witness. Bergrin Br. 55 (citing, *e.g.*, App. 8799, 8809). In truth, the Court interrupted the witness because he was offering irrelevant statements that were meant to win the jury's sympathy. For example, the judge cut off the witness when he was about to discuss Bergrin's military record or Bergrin's past legal work for U.S. soldiers, topics that the Court had previously

5

ruled off-limits. *See*, *e.g.*, App. 8799, 8809. Bergrin claims that the Court "hostilely"

interrupted him multiple times during his opening statement, sending a "message to the

jury . . . [that] the defendant could not be trusted and the defense case did not merit the

jury's consideration." Bergrin Br. 33 (citing, *e.g.*, App. 1178). In truth, the stern but polite

command that Bergrin not spend another two hours on his opening was delivered when *the*

*jury was not present*. *See* App. 1178. Bergrin claims that the "court threatened to allow

testimony about Bergrin's sexual relations with women who worked at NY Confidential,

including that he treated them roughly." Bergrin Br. 63. In fact, the record reveals a run-

of-the-mill conversation between the judge and counsel about whether to exclude certain

evidence under Rule 403. *See* App. 4247–55. Furthermore, the Court was amenable to

Bergrin's Rule 403 argument, such that the judge stated: "I tend to agree with you about

some of the information only because I don't know, number one, how relevant it all is,

even if it were relevant, as to whether or not it's substantially outweighed, I'm not sure."

App. 4248. Bergrin claims that he was discredited "in the jury's eyes as a lying

malingerer" because "there was a delay in this very case as a result of Bergrin's bout with

influenza" and evidence of a prior health-related adjournment in one of Bergrin's cases

was admitted. Bergrin Br. 65. In truth, the jury never knew *who* had the influenza that

delayed the start of the trial because the Court stated, without attribution: "[s]orry there

was a brief bout of influenza." App. 1045.

     In sum, the record demonstrates that Bergrin received a fair trial.

## III

Finally, we turn briefly to Bergrin's argument that his sentence was improper. Here again, Bergrin raises a host of claims, including that his sentence violated the Eighth Amendment's ban on cruel and unusual punishment and that he was entitled to an evidentiary hearing. These arguments have no merit, essentially for the reasons cited by the District Court. A sentence violates the Eighth Amendment when it is so disproportionate to the offense that "the punishment is more criminal than the crime." App. 10,073 (quoting *United States v. Sarbello*, 985 F.2d 716, 724 (3d Cir. 1993)). That cannot be said of Bergrin's life sentence and his central role in the murder of FBI informant Kemo McCray. Next, the District Court rightly refused to hold an evidentiary hearing because it was a thinly veiled attempt to retry the case. App. 10,065–68. Having presided over this lengthy trial, Judge Cavanaugh was not required to conduct an evidentiary hearing that would have been superfluous.

## IV

For the reasons stated, we will affirm Bergrin's judgment of conviction and sentence.