**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2828
_____

UNITED STATES OF AMERICA

v.

PAUL W. BERGRIN,
                                        Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cr-00369-001)
District Judge:  Honorable Madeline C. Arleo
_____

Argued
November 17, 2021

Before:   AMBRO, JORDAN, and ROTH, *Circuit Judges*

(Filed: April 6, 2022)
_____

Lawrence S. Lustberg   [**ARGUED**]
Gibbons
One Gateway Center
Newark, NJ   07102
        *Counsel for Appellant*

Mark E. Coyne   [**ARGUED**]
Steven G. Sanders
Office of United States Attorney
970 Broad Street – Rm. 700
Newark, NJ   07102
        *Counsel for Appellee*

OPINION*
_____

JORDAN, *Circuit Judge*.

Paul Bergrin was a high-profile criminal defense attorney who became a high-profile criminal. In 2013, after a seven-week trial, he was convicted of conspiring to kill adverse witnesses and operating a drug-trafficking business out of his law offices. He now seeks a new trial, alleging that he and his team of private investigators have since found an assortment of individuals who would testify that he was framed. The District Court denied his motion, rejecting all of his arguments. So do we. Consequently, we will affirm.

I.      **BACKGROUND**[1]

Following service as a federal prosecutor, Bergrin began an apparently successful private practice representing people accused of crimes. The veneer of success peeled away in 2009, when he became the accused. As described in the operative indictment, the charges against him included instigating the murder of Kemo McCray to protect Bergrin's client, William Baskerville, from McCray's expected testimony (the "Kemo Murder"); plotting to kill witnesses in the case against Vicente Esteves (the "Esteves Plot"); and operating a drug-trafficking business. After Bergrin's first trial on the Kemo

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] For more details about the charges against Bergrin, see *United States v. Bergrin*, 599 F. App'x 439 (3d Cir. 2014); *United States v. Bergrin*, 682 F.3d 261 (3d Cir. 2012); and *United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011).

Murder ended with a hung jury, the District Court held a second trial in 2013 that included additional charges related to the Esteves Plot and drug trafficking. Bergrin was convicted on all counts, and he was sentenced to concurrent terms of life imprisonment.

Pursuant to Federal Rule of Criminal Procedure 33, Bergrin filed a motion for a new trial. He claimed to have discovered new evidence – in the form of phone records, wiretap recordings, and statements from almost a dozen individuals – demonstrating that the prosecution's key witnesses lied during his trial. He also said that the prosecution suppressed certain exculpatory evidence in violation of its *Brady* obligations. The District Court denied Bergrin's motion, and he has timely appealed.

## II.  DISCUSSION[2]

### A.  Motion for a New Trial Based on Newly Discovered Evidence

We review for abuse of discretion the District Court's denial of a Rule 33 motion for a new trial based on new evidence. *United States v. Saada*, 212 F.3d 210, 215 (3d Cir. 2000). "[A] district court abuses its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *United States v. Brown*, 595 F.3d 498, 511 (3d Cir. 2010) (citation omitted). "Courts should exercise great caution in setting aside a verdict reached after fully-conducted proceedings, and particularly so where the action has been tried before a jury."

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

*United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008) (internal quotation marks and citation omitted).

In *United States v. Iannelli*, 528 F.2d 1290 (3d Cir. 1976), we ruled that, when presented with allegedly new evidence, a district court may order a new trial on that basis only if the proffered evidence meets the following five requirements:

> (a) the evidence must be[,] in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on[] must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Id.* at 1292. Failure to satisfy any of those requirements is a ground for denying the Rule 33 motion, *Kelly*, 539 F.3d at 182, and the movant bears a "heavy burden" in justifying a new trial. *Saada*, 212 F.3d at 216 (citation omitted).

Under the first two *Iannelli* requirements, evidence is not "newly discovered" if, at the time of trial, it was actually known or could have been known through reasonable diligence by the defendant or his counsel. *United States v. Cimera*, 459 F.3d 452, 461 (3d Cir. 2006). When determining whether the defendant exercised "reasonable diligence," the court must "carefully consider the factual circumstances of the case." *Id.* "[T]o satisfy the diligence standard, counsel must conduct further inquiry once the circumstances alert her to the existence of additional information that has a reasonable possibility of proving material to the defense." *United States v. Noel*, 905 F.3d 258, 272 (3d Cir. 2018).

4

Under the last *Iannelli* requirement, when determining whether the newly discovered evidence would probably result in an acquittal, the district court has to assess the credibility of the evidence. *Kelly*, 539 F.3d at 188 ("[I]t is the job of the district court, either on affidavits or after an evidentiary hearing[,] … to decide whether the newly discovered evidence is credible[.]" (citation omitted) (third alteration in original)). "[A] district court's statement that newly discovered evidence 'is not credible' … is perfectly acceptable as long as the court sets forth its reasoning." *Id.* at 189 n.14. If the district court determines that the evidence is credible, it must then determine "whether a jury probably would reach a different result upon hearing the new evidence." *Id.* at 189. In reaching that determination, the district court "must weigh the [new] testimony against all of the other evidence in the record," including what the jury already weighed in the defendant's initial trial. *Id.*

### 1. Evidence Relating to the Kemo Murder

The record at trial[3] showed that Bergrin was the lawyer for a drug-trafficking organization run by Hakeem Curry. In that capacity, Bergrin was retained to represent Curry's underlings, including William Baskerville. After Baskerville was arrested in 2003 for selling crack cocaine, he told Bergrin that his "buyer" was a police informant named Kemo. Bergrin then met with Curry and several of his associates to discuss Baskerville's situation. We previously summarized that meeting as follows:

> According to [Anthony] Young, [an associate of Curry who eventually became a key government witness,] Bergrin told the group that Baskerville

---

[3] Our reference here is to the second trial, which produced the guilty verdicts.

5

> "was facing life in prison for that little bit of cocaine," and "if Kemo testif[ies] against Will, Will was never coming home. [Bergrin] said … don't let [Kemo] … testify against Will, and if he don't testify, [Bergrin will] make sure he gets Will out of jail." Bergrin repeated: "no Kemo, no case," a phrase he reiterated upon leaving the group while pointing his finger.

*United States v. Bergrin*, 599 F. App'x 439, 441 (3d Cir. 2014) (internal citations omitted). A few months later, Young shot and killed Kemo McCray. Bergrin was convicted of conspiring to commit that murder.

Bergrin now alleges that he has discovered two new witnesses who would testify that Young lied on the stand at trial to frame him as a conspirator in the Kemo Murder.

The first of those new witnesses is Charles Madison, a friend of Young's. According to Madison's affidavit, Young called Madison in late 2005 to say that he was getting out of prison early. After Madison inquired further, Young said that he had falsely confessed to shooting Kemo in order to get a more lenient sentence. Young also told Madison that prosecutors had kept pressuring him about Bergrin until he eventually made up the story about the "no Kemo, no case" meeting. Young stated, "[Bergrin] didn't do anything[,] but if I don't say that [Bergrin was involved in the murder,] my deal is off the table." (App. at 4402.)

Bergrin's second proposed witness is Hassan Miller, a fellow inmate of Young's. The government had Miller wear a body wire to record a conversation with Young while they were in prison together, a conversation in which Young admitted that he was the one who shot Kemo. Miller later told Bergrin's investigators, however, that Young lied in that conversation. Miller also reported that Young was "going around saying … 'I'm going to say Paul … had something to do with it, and he orchestrated the whole thing.'"

6

(App. at 4412-13.)  Young allegedly told Miller that he was going to "pin this on Paul" so that he could "get out faster[.]"  (App. at 4412, 4415.)  Miller further claimed that he later informed the government that Young was lying about Bergrin.

The District Court held that Bergrin had not met his heavy burden of establishing that Madison's or Miller's testimony would probably produce an acquittal.  That was not an abuse of discretion.

As an initial matter, both their stories are hearsay and would only be admissible for attempting to impeach Young.  *See* Fed. R. Evid. 613(b) (permitting admission of extrinsic evidence of a witness's prior inconsistent statement).  But Bergrin already spent multiple days at trial attempting to impeach Young on cross-examination, and the jury evidently still accepted Young's testimony.  We cannot disagree with the District Court's assessment that the additional impeachment evidence from Madison and Miller would not have tipped the balance about Young's credibility in Bergrin's favor.

That is particularly true given Madison's and Miller's own credibility issues.  As the District Court noted, a jury would have to grapple with Madison's "lengthy criminal history" and certain "meaningful logical flaws" in his assertions, including the "far-fetched theory" that Young had falsely confessed to a murder in exchange for leniency on a state weapons charge.  (App. at 23 & n.15.)  The District Court also opined that Miller's interview "suffers from the same admissibility and credibility issues as Madison's statements."  (App. at 11 n.8.)  For example, his unsworn and unsigned statements came from an informal jailhouse interview with Bergrin's private investigators, without the presence of counsel.

Their credibility is further undermined by contradictions and inconsistencies in their statements. Several of Madison's statements conflict with the trial record, which showed that Young cold-called the FBI to implicate Bergrin before he was even facing any charges, as opposed to after being pressured to do so by the prosecution in order to secure a plea deal. Likewise, several of Miller's statements to Bergrin's investigators conflict with his own previous statements and the trial record. For example, Miller said that the government had him wear a wire to "catch [Young] in his lies against Paul Berg[ri]n and Hakeem Curry," although the record reflects that the government's purpose was to catch Young confessing that he himself was the shooter. (App. at 4421.) Miller had previously advised the government that Young "confessed to him repeatedly regarding shooting [Kemo]." (App. at 11 n.8.) The District Court properly weighed the record and the proffered testimony in finding that Madison and Miller lacked credibility, a conclusion that is not clearly erroneous. *See Kelly*, 539 F.3d at 188.

Furthermore, Madison's and Miller's accounts would probably need to do more than impeach Young, because his testimony was not the only evidence inculpating Bergrin in the Kemo Murder. As the District Court properly observed, a jury weighing Madison's or Miller's testimony against Young's testimony would consider the other "sufficient" and "significant" inculpatory evidence that favors Young's side of the story. (App. at 11 n.8, 23.) *See Kelly*, 539 F.3d at 189 ("[The district court] must weigh the

8

testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial.").[4]

Based on the questionable credibility of Madison's and Miller's proposed testimony, the limited utility of the testimony as impeachment evidence, and the record's independent evidence supporting Bergrin's guilt, the District Court did not abuse its discretion in finding that the presentation of Madison and Miller as witnesses would not probably produce an acquittal.[5]

### 2. Evidence Relating to the Esteves Plot

Much of the government's evidence of Bergrin's involvement in the Esteves Plot centered around body-wire recordings made by Oscar Cordova. Cordova was a confidential informant for the government who posed as a hitman. At the government's behest, Cordova used a tamper-proof device to record various conversations in which Bergrin discussed murdering witnesses and trafficking drugs. One such conversation involved a potential witness against Esteves. When Cordova brought up killing the witness, Bergrin told him that "[i]t's gonna help" Esteves's case. (App. at 2097-98.)

---

[4] For example, Bergrin later told a client that he would kill an informant and that it would not be his first time – inferably a reference to the killing of Kemo. *Bergrin*, 599 F. App'x at 441. Also, rather than denying his involvement in the scheme, Bergrin boasted to his law partner that the government lacked the evidence to convict him of the Kemo Murder – which supports a similar inference. *Id.*

[5] Bergrin's failure to establish that the evidence would probably produce an acquittal is sufficient to disqualify it as a basis for granting a new trial. *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008). Therefore, we need not address whether the evidence was in fact newly discovered.

Bergrin then instructed Cordova to "put on a ski mask" and "make it look like a robbery," emphasizing that "[i]t cannot under any circumstances look like a hit."  (App. at 2098-99.)

Bergrin argues that he has discovered a witness, Savina Sauseda, who would testify that Cordova tampered with the recordings in order to falsely incriminate Bergrin. Sauseda stated that she came across a recording device that Cordova had left in her home. She listened to the recordings, and it sounded to her like Cordova had been tampering with the tapes and "trying to transfer certain portions of conversations from one tape onto a different tape or another tape recorder[.]"  (App. at 4472.)  She also accused Cordova of lying on the witness stand.

The District Court did not abuse its discretion in finding that Sauseda's proposed testimony was unlikely to produce an acquittal at trial.  In particular, her testimony would not probably cause a jury to reject the truthfulness and accuracy of Cordova's recordings. Besides Cordova's own testimony, other witnesses involved in the Esteves Plot testified at trial that Bergrin directed Cordova to kill witnesses.  Moreover, Bergrin had already advanced at his second trial his theory that the recordings were doctored, presenting expert testimony that they could have been tampered with, but the jury evidently rejected that argument.  Again, we see no abuse of discretion in the District Court's conclusion that Sauseda's testimony was not likely to persuade a jury to reach a different conclusion – particularly given that Bergrin's own expert conceded on cross-examination that the

specific tapes in question could not have been intentionally altered by Cordova in the way that Sauseda now suggests.[6]  That proposed testimony thus does not warrant a new trial.

### 3. Evidence Relating to the Drug-Trafficking Business

Bergrin was also convicted of conspiring to operate a cocaine-trafficking business. Trial evidence showed that he connected buyers with cocaine suppliers and personally supplied clients with cocaine from his law office.  Now, however, he presents statements from three witnesses to show that he was not involved in the drug trafficking and that the government's witnesses fabricated their stories.  He also asserts that he discovered phone records demonstrating that he did not participate in the drug trafficking.  We address each piece of evidence in turn.

#### a. Shariff's Proffered Testimony

Amin Shariff was a federal prisoner who had cooperated with the government on other cases.  According to Shariff, government agents continuously pressured him to testify about Bergrin's involvement in drug trafficking, even after Shariff said he knew nothing of the sort.  Shariff eventually sought advice from his cousin, Eugene Braswell, who was also in prison.  Braswell told Shariff to lie:  "Jump on Paul's case.  Everyone is doing it, including me.  …  He's our ticket to freedom."  (App. at 4573.)  Braswell ultimately testified for the government against Bergrin, but Shariff refused to do so.

---

[6] The District Court also held that Sauseda's proposed testimony would be merely impeaching and cumulative, and Bergrin contests that holding.  For the same reasons discussed above in note 3, however, we need not address that issue because we can affirm on the District Court's alternative ground.

11

Shariff's proffered testimony does not justify a new trial, as it would not probably produce an acquittal. Even if the testimony could be used to impeach Braswell, Bergrin has not established that Braswell's testimony was so critical to the jury's decision that impeaching it would cause a jury to decide the case differently. The inculpatory evidence against Bergrin includes the testimony of at least four other co-conspirators who told about his drug-trafficking business; hours of recordings of him discussing and conducting that business; and the seizure of 53 kilograms of cocaine from a property he owned. Shariff's impeachment of Braswell would, in all likelihood, not persuade a jury to ignore or disbelieve all of that inculpatory evidence.[7] Furthermore, Shariff has his own credibility issues. For example, although he now says that he had "never heard of Paul being involved with drugs, doing drugs, [or] selling drugs[,]" he previously told the government he had heard that Bergrin used cocaine and associated with individuals who smuggled drugs to his clients in prison. (App. at 4573.) In light of the independent evidence of Bergrin's guilt and Shariff's credibility problems, the proffered testimony would not probably result in acquittal, and the District Court did not err in rejecting it as grounds for a new trial.[8]

_____

[7] Contrary to Bergrin's argument, Braswell's statement to Shariff that "[e]veryone" was jumping on Bergrin's case is not sufficiently concrete or credible to allow a reasonable jury to conclude that all of the government's witnesses were lying. (App. at 4573.) A jury could just as easily conclude that "everyone" was opting to testify truthfully.

[8] The District Court rejected Shariff's proffered testimony on the separate ground that it was not newly discovered. It decided that, because Bergrin knew that the government had interviewed Shariff in unrelated cases and that Bergrin was a topic of conversation in those interviews, Bergrin should have conducted his own interview of

12

### b. Jauregui's Proffered Testimony

Yolanda Jauregui was Bergrin's co-defendant on the drug-trafficking charges. When moving for a new trial, Bergrin submitted an unsigned declaration from Jauregui stating that Bergrin was not involved in the drug trafficking, that Jauregui and others hid their drug trafficking from him, and that the government had coerced her into lying about Bergrin's involvement. The District Court rejected the Jauregui declaration as a basis for a new trial primarily because of the "highly suspicious circumstances" surrounding its creation. (App. at 17 n.12.)

That was not an abuse of discretion. Bergrin drafted the declaration himself, before his investigators had even interviewed Jauregui. Jauregui only received a copy of the affidavit after lawyers and movie producers associated with Bergrin told her about "lucrative" rights to a book and movie deal that were contingent on her cooperation. (App. at 16.) And although Bergrin says that Jauregui read the declaration and affirmed that it was materially accurate, she never signed it. Based on those circumstances, the District Court was well within its discretion in making an adverse credibility determination. *Kelly*, 539 F.3d at 188. And even if the document had a more reliable provenance, it is not probable that it would persuade a jury to disregard all the inculpatory evidence in the record, as discussed above, and so to acquit Bergrin. The

---

Shariff before trial. There may be reason to doubt that Bergrin should have known about Shariff's conversations with Braswell, but we may affirm the District Court on any ground supported by the record, even if the District Court did not address that ground. *United States v. Rocco*, 587 F.2d 144, 148 (3d Cir. 1978).

District Court's rejection of the Jauregui declaration as a ground for a new trial was not an abuse of discretion.

### c.    Vannoy's Proffered Testimony

Theresa Vannoy was raised by Jauregui and lived with her for many years, including at the time when Bergrin was dating Jauregui and had moved in with them. After trial, Bergrin's investigators interviewed Vannoy's biological mother, who supposedly said that Vannoy had told her that "Paul did not know anything" about the drug trafficking and that "Paul was never around when any of the drugs or money or any of this stuff was being talked about." (App. at 4506-07.) Bergrin says Vannoy would testify consistent with what she told her biological mother.

The District Court correctly concluded that Vannoy's proposed testimony could not support Bergrin's Rule 33 motion, because Bergrin failed to demonstrate that he exercised reasonable diligence in attempting to procure her testimony before trial. Even assuming that the substance of Vannoy's testimony was not "actually known" to Bergrin, it "could have been known by [his] diligence." *Cimera*, 459 F.3d at 461. Vannoy was raised by Jauregui and stayed with her, including during a time when Bergrin lived with them. In addition, Vannoy had told Bergrin that she had seen Jauregui with Alejandro Barraza-Castro, another co-defendant in their drug-trafficking scheme. Vannoy's proximity to Bergrin, Jauregui, and Barraza-Castro was sufficient to "alert [Bergrin] to the existence of additional information that ha[d] a reasonable possibility of proving material to [his] defense." *Noel*, 905 F.3d at 272. Yet Bergrin failed to exercise the necessary diligence to discover her statements. The record suggests that Bergrin did

14

nothing more than send one subpoena to Vannoy's biological mother, which arrived late, and he allegedly sent one subpoena to Vannoy, which it seems was never delivered.[9] Bergrin was an experienced criminal defense attorney with a team of private investigators and almost four years to prepare for trial. Based on a "careful[] consider[ation]" of those factual circumstances, *Cimera*, 459 F.3d at 461, the District Court could rightly exercise its discretion to reject Vannoy's proposed testimony as a basis for a new trial.

### d. Phone Records

Bergrin asserts that, prior to his arrest, he called DEA Agent Gregory Hilton on numerous occasions to report instances of drug trafficking, which arguably implies that he was not involved in drug trafficking himself. During pre-trial discovery, Bergrin was given records of his own telephone calls dating back many years. It was only after trial, however, that Bergrin identified which of those calls were made to Agent Hilton. The phone records showed that Bergin made 54 short calls – typically lasting only one minute – to Agent Hilton's phone number between October 2004 and February 2008.

The District Court held that, even if the phone records qualified as newly discovered evidence, they would not probably result in an acquittal at a new trial. The records shed no light on the substance of the calls, and the mere fact that Bergrin placed

---

[9] Bergrin's argument that Vannoy was exceptionally difficult to track down because her mother "secretly" arranged to take her back to Louisiana is unpersuasive. (Opening Br. at 41.) Vannoy did not go to Louisiana until February 2012, almost three years after Bergrin was indicted and arrested. By the time of trial, Bergrin knew that Vannoy's mother lived in Louisiana and had even had his investigators interview her – indicating that Vannoy's pre-trial location was not an unsolvable mystery.

over fifty short calls to Agent Hilton's number in the course of a few years would not probably persuade a new jury to acquit him. Furthermore, contrary to Bergrin's argument, the phone records' potential to impeach Agent Hilton or refresh his recollection does not justify holding a new trial. Bergrin already had the option to call Agent Hilton as a defense witness at trial, and he chose not to, perhaps because Agent Hilton denied to Bergrin's counsel that the calls ever occurred. Bergrin has not demonstrated that Agent Hilton's response would be any different if he were shown the phone records. And the mere impeachment of Agent Hilton would not probably outweigh "the other substantial evidence" of Bergrin's drug-trafficking activities. (App. at 22.) The District Court did not abuse its discretion in rejecting the phone records as a reason for a new trial.[10]

### 4. An Evidentiary Hearing on the New Evidence

Bergrin argues that, at a minimum, the District Court should not have denied his motion for a new trial based on newly discovered evidence without holding an evidentiary hearing. But a district court need not hold a hearing on every motion for a new trial. *United States v. Herman*, 614 F.2d 369, 372 (3d Cir. 1980). When deciding whether newly discovered evidence is credible or whether it would probably produce an acquittal in a new trial, the District Court may reach its conclusion "either on affidavits *or*

---

[10] Because we affirm the District Court's conclusion that the phone records would not probably result in an acquittal, we need not address the government's argument that the District Court erred in finding that the phone records were not newly discovered evidence under Rule 33.

16

after an evidentiary hearing[.]" *Kelly*, 539 F.3d at 188 (emphasis added); *see also United States v. Glinn*, 965 F.3d 940, 942-43 (8th Cir. 2020) (explaining that "the district court may ordinarily decide factual issues based on affidavits without an evidentiary hearing" and that a hearing is only required in "exceptional circumstances"). We review for abuse of discretion the District Court's decision to not hold an evidentiary hearing. *Noel*, 905 F.3d at 270 n.7. While we may reverse the District Court's decision if its underlying findings are "wholly unsupported by evidence," we may not reverse merely because we believe that convening a hearing would have been the "better course" for the District Court to have followed. *Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1251 (3d Cir. 1985) (deferring to the district court's finding, on the affidavits, that new evidence would not have undermined the credibility of the government's witness).

There are no exceptional circumstances in this case mandating an evidentiary hearing. The District Court's opinion demonstrates that it thoroughly considered the trial record and the numerous affidavits and exhibits that Bergrin submitted, all of which formed an adequate basis for the District Court's decision.[11] Its findings, including with regard to the credibility and persuasive weight of the evidence, are amply supported by

---

[11] Bergrin argues that we should not defer to the credibility determinations that Judge Arleo made without an evidentiary hearing because she was not the judge who presided over Bergrin's trial. Although Rule 33 motions are regularly heard by the same judge who presided at trial, an evidentiary hearing is not necessarily required when that is not the case. *See, e.g.*, *United States v. Persico*, 339 F. Supp. 1077, 1084 (E.D.N.Y.), *aff'd*, 467 F.2d 485 (2d Cir. 1972). We decline to adopt such a blanket rule. Furthermore, Bergrin has not given us any meaningful reason to doubt that Judge Arleo was completely familiar with the trial record and capable of discerning the credibility and weight of the evidence, even without having heard the original testimony herself.

the record.  *Lima*, 774 F.2d at 1251.  Thus, the District Court did not abuse its discretion in declining to hold an evidentiary hearing.

### B.       Motion for New Trial Based on *Brady* Violations

Bergrin argues that the District Court erred in denying his motion for a new trial based on *Brady* violations.  "In considering a district court's ruling on a motion for a new trial based on the failure to disclose *Brady* materials, we will conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate."  *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993) (citation and internal quotation marks omitted).  "Where the district court applies the correct legal standard, its weighing of the evidence merits deference from the Court of Appeals[.]"  *Id.* (citation and internal quotation marks omitted).

Under *Brady* and its progeny, the government violates a defendant's Fifth Amendment right to due process if it suppresses "evidence favorable to an accused … where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The government also may not suppress evidence relating to the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  To establish a due process violation under *Brady,* the defendant must show that: "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment."  *United States v. Schneider*, 801 F.3d 186, 202 (3d Cir. 2015) (citation and internal quotation marks omitted).  And, again, *Brady*

18

obligates prosecutors to produce both exculpatory evidence and evidence that might be impeaching. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

In short, "[t]he government must disclose all favorable evidence[,]" even if the defendant could have obtained the evidence himself with reasonable diligence. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 292 (3d Cir. 2016) (en banc). But the government need not disclose such evidence when it is aware that defense counsel already has the material. *Id.* When the government does turn over all favorable evidence, however, we will still hold that it has "suppressed" the evidence if "a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant[,]" thus "effectively nullif[ying]" defense counsel's knowledge of that evidence. *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005).

Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation and internal quotation marks omitted). A reasonable probability exists when the favorable evidence puts the case in a different light and "undermines confidence in the outcome of the trial." *Id.* at 434-35 (quoting *Bagley*, 473 U.S. at 678).

### 1.    The Curry Tapes

Bergrin alleges that the government suppressed exculpatory information contained in the so-called "Curry Tapes," which consist of hundreds of CDs containing thousands of individual recordings from wiretaps of Hakeem Curry. While the government turned the recordings over to Bergrin prior to trial, it later informed Bergrin's counsel that it

19

would not seek to admit the recordings into evidence because they were not timely sealed. The government suggested that the Curry Tapes would have introduced "some very damaging evidence" for Bergrin, but, according to Bergrin's counsel, prosecutors "gave no indication that the [Curry Tapes] contained significant exculpatory information[.]" (App. at 4779, 4577.) Bergrin himself claims that the government said the Curry Tapes "were highly inculpatory and offered no exculpatory evidence." (App. at 4724.) Bergrin now alleges that, contrary to the government's representations, the Curry Tapes did contain exculpatory evidence, in that they revealed discrepancies in certain details of Young's testimony about Bergrin's involvement in the Kemo Murder.

The District Court rejected Bergrin's argument about the Curry Tapes, concluding that the government "did not suppress" the tapes because "they were in [Bergrin's] possession for nearly three years before the Second Trial." (App. at 24.) But, as just noted, the evidence could still be said to be "suppressed" under *Brady* if the government "misl[ed] the defense into believing the evidence [would] not be favorable to the defendant." *Pelullo*, 399 F.3d at 213. The District Court did not address whether that potential exception applied.

Nevertheless, the District Court did not err in rejecting Bergrin's *Brady* argument regarding the Curry Tapes because Bergrin has not established that he was misled. Curry had previously told Bergrin that the recordings did not prove the existence of a "no Kemo, no case" meeting, so Bergrin was already on alert that they might be helpful to his defense. Furthermore, the only evidence suggesting that the government said anything potentially misleading comes from Bergrin's own declaration. Even then, he does not

20

identify who, if anyone, said that the tapes contained no exculpatory material, what exactly that person said, or when that person said it. And Bergrin's version of the story conflicts with his own counsel's declaration, which indicates that the government only asserted that there was abundant inculpatory material, not a lack of exculpatory material. In fact, the record shows that the reason for the government telling Bergrin that the Curry Tapes contained "some very damaging [inculpatory] evidence" was to dissuade him from "open[ing] the door" by trying to proffer other parts of the Curry Tapes – thus clearly signalling to Bergrin that some of the calls might indeed appear favorable to him. (App. at 4778-79.)

In sum, because the Curry Tapes were turned over and the government did not mislead Bergrin about them, the District Court was justified in deciding that the Curry Tapes were not suppressed and there was no *Brady* violation.

### 2. Miller's Statements

Bergrin also argues that the government violated *Brady* by failing to disclose Miller's statements about Young's accusations against Bergrin. The District Court rejected that claim for several reasons. First, it held that Bergrin failed to show "that he exercised reasonable diligence in obtaining Miller's proffered new testimony from other sources at or before trial[.]" (App. at 24-25 (citing *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991).) That was legal error. *Dennis* overruled *Perdomo* and held that

21

a defendant's exercise of due diligence is not a consideration when deciding whether the government has complied with its *Brady* obligations. *Dennis*, 834 F.3d at 292-93.

Still, the District Court alternatively rejected the *Brady* claim "because [Miller's] testimony pales in comparison to other evidence and credibility issues[.]" (App. at 25.) That is not clearly erroneous. It is, on the contrary, completely accurate. As discussed above, although Miller's testimony might have been used to impeach Young, its origin was questionable, and it conflicted with statements Miller had previously made to the government. Its impeachment value was unlikely to overcome the evidence on which Bergrin was convicted. *Kyles*, 514 U.S. at 433. Therefore, when the District Court found that Miller's statements shed only a "pale[]" light on the case and would be "not likely to exonerate [Bergrin]" (App. at 11 n.8, 25), it appropriately determined that the allegedly suppressed evidence was not material and that a new trial was not warranted.

## III.    CONCLUSION

In sum, the District Court did not err in rejecting Bergrin's claims of newly discovered evidence and *Brady* violations as grounds for a new trial. We will therefore affirm.